AQUAPLEX, INC. and James Edward Jones, Jr., Petitioners,

v.

RANCHO LA VALENCIA, INC. and Charles R. "Randy" Turner, Respondents.

No. 08–0280.

Supreme Court of Texas.

Oct. 30, 2009.

D. Douglas Brothers, Ben Jay Cunningham, Gary L. Lewis, Amy L. Saberian, George & Brothers, L.L.P., Austin, TX, for Petitioners.

Brian Alan Turner, Law Office of Brian Turner, Craig T. Enoch, James G. Ruiz, Elliot Clark, Winstead PC, Austin, TX, for Respondents.

PER CURIAM.

In this case, we decide whether the evidence presented at trial was legally sufficient to support the award of damages. The trial court believed so and entered judgment on the jury verdict, but the court of appeals reversed, holding that no evidence supported the amount of damages awarded. "[B]ecause there is no legally sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages," *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex.1998), we reverse the damages portion of the court of appeals' judgment and remand the case to the court of appeals.

Randy Turner established Rancho La Valencia, Inc. to acquire a piece of land called the Tumbleweed Property located in Austin. Rancho took out a $2.4 million loan from OmniBank to develop the property, with Turner as the guarantor. Problems arose during the development, so OmniBank required Rancho to bring in a new partner before it would continue financing. A Rancho employee put Turner in touch with Eddie Jones who agreed to a joint venture. For purposes of the joint venture, Jones established Aquaplex, Inc. Rancho and Aquaplex (through their representatives Turner and Jones) then signed the Tumbleweed Investment Joint Venture Agreement (JVA), which included the following provisions:

- *Contributions:* Rancho would contribute the property and existing project; Aquaplex would contribute $400,000.

- *Loans:* Only Rancho and the property remained responsible for the existing $2.4 million OmniBank loan—Aquaplex had no liability. Aquaplex also made a $644,000 loan to the joint venture, with repayment priority second only to the OmniBank loan.
- *Ownership Interest:* Aquaplex—60%; Rancho—40%.
- *Management:* Aquaplex would be managing partner and would be paid up to a $6,000 monthly management fee. Aquaplex could make all but "major decisions" without Rancho's approval. One "major decision" was selling any of the development's properties for less than $60,000 per unit. Even in a major decision, however, a partner could not unreasonably withhold its approval.
- *Cash Calls:* Aquaplex, as managing partner, could issue a cash call when needed and both partners would be responsible for their pro-rata share. If a partner failed to comply with the cash call, then the other partner could either contribute the amount, loan the joint venture the amount, or could seek to dissolve the joint venture.
- *Third-party Offers:* On an offer of purchase by a third-party of the property, either party that dissented to the sale could make a matching offer to buy the property. If no offer was made, the sale would go through.

Disputes between Aquaplex and Rancho arose soon after the JVA was signed. Aquaplex terminated the project manager and took over the day-to-day management. Aquaplex also demolished the clubhouse, which Rancho had already completed. Aquaplex then issued a cash call under the terms of the JVA, but Rancho refused to contribute. Rancho sued Aquaplex, alleging fraud, breach of duties under the JVA, and conversion and destruction of partner-

ship assets. Rancho claimed that Aquaplex overstated the budgetary needs that led to the cash call and was needlessly destroying property. Aquaplex counterclaimed, alleging frivolous suit, negligent misrepresentation, fraud, breach of the JVA, and breach of warranty. Aquaplex claimed that, prior to the JVA, Rancho misrepresented the status of the project and Rancho's own financial ability to meet continuing financial obligations. In the meantime, Rancho's loan with OmniBank went into default, causing concerns about a potential foreclosure.

The parties proceeded to mediation. They entered into a Rule 11 memorandum of settlement agreement (MSA), which envisioned selling the property or ending the joint venture within six months. The terms of the MSA provided that:

- OmniBank would roll all existing interest into the note and extend it for six months.
- Rancho would deposit $100,000 into an OmniBank account to pay all interest, taxes, and expenses on the property for those six months.
- The property would be listed for six months at $5 million, but that the property could be sold at any price exceeding $4 million. Rancho retained a right of first refusal on any offer.
- Rancho could acquire Aquaplex's interest in the joint venture for $1,645,425 (the approximate amount of Aquaplex's capital contribution, loan, interest, and management fees) at any time in the next six months.
- If the property was not sold or acquired in six months, Rancho's interest passed to Aquaplex.

OmniBank also agreed under a forbearance agreement not to post the property for foreclosure and if the property was not sold, to extend the maturity of the note

with interest at the then-existing federal funds rate. The MSA contemplated the later execution of a formal settlement agreement. However, Rancho never established the $100,000 account and a formal settlement agreement was never executed, causing OmniBank's forbearance agreement to lapse.

After the collapse of the settlement, the case proceeded to trial. A few days before trial, Rancho's trial counsel filed a motion to withdraw, claiming that his services were being used to perpetuate a fraud. Rancho then filed for bankruptcy, which temporarily stayed the trial court proceedings. During the bankruptcy, an individual named Jeff Greenberg offered to purchase the Tumbleweed Property (the "Greenberg Offer") for $4.05 million. Rancho refused to consent to the sale and filed a *lis pendens* on the property to prevent a sale of the property until the dispute was adjudicated. The bankruptcy court later dismissed Rancho's bankruptcy suit as a bad-faith filing. The trial then resumed. Aquaplex amended its petition to include allegations of breach and fraud related to the MSA. At the close of Rancho's case in chief, the court directed a verdict against Rancho on all of its claims, ruling that Rancho breached the MSA as a matter of law for failing to fund the $100,000 account. This left Aquaplex's claims as the subject of the remainder of the trial. In a video deposition shown at trial, Rancho's former attorney testified under the crime-fraud exception about his dealings with Turner. *See* Tex.R. Evid. 503(d)(1) ("There is no [attorney-client privilege] ... [i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."). The former attorney testified that he discovered that Rancho did not intend to put up the $100,000 deposit required under the MSA and that Rancho was negotiating with bankruptcy attorneys on the side during the settlement process. The jury found that Rancho had breached both the JVA and the MSA and also committed fraud in connection with both. The jury also found that Rancho had assigned its interest in the joint venture to OmniBank in an earlier document.

Aquaplex elected to recover damages for fraud under the MSA and pursued declaratory and injunctive relief for the breach of the JVA. The trial court entered judgment on the jury verdict, which awarded Aquaplex:

- actual damages for fraudulent inducement under the MSA, itemized as:
 - ▶ $597,183.70 for the loss of the Greenberg Offer;
 - ▶ $100,000 for the OmniBank deposit that Rancho failed to set up;
 - ▶ $279,000 for the loss of the forbearance agreement with Omni-Bank; [1]
 - ▶ $35,000 for the amount Aquaplex spent on legal representation during the bankruptcy proceedings.
- punitive damages of $1.5 million under the MSA
- declaratory relief that Rancho had no rights under the JVA because they were divested by either: (1) the MSA; (2) an assignment of the JVA to Omni-Bank; (3) paragraph 5.2(j) of the JVA;(4) paragraph 5.9 of the JVA
- injunctive relief that Rancho has no rights in the property and cannot interfere with the sale of the property

---

1. The jury actually awarded $279,010 for the loss of the forbearance agreement, but based on the judgment's actual damages award of $1,011,183.70, it appears the trial court rounded this number down to $279,000.

• $283,624 in attorney's fees

• an avoidance of the *lis pendens* on the property.

 Rancho appealed. In its initial opinion, the court of appeals reversed the trial court's judgment, holding that: (1) the single injury doctrine precluded recovery under both the JVA and the MSA;[2] (2) there was no evidence that fraud relating to the MSA caused damages to Aquaplex; and (3) Aquaplex was barred from punitive damages because it did not prove actual damages. 253 S.W.3d 728, 732–36 (Tex.App.-Amarillo 2007). On rehearing, the court of appeals acknowledged that its initial opinion failed to address the declaratory and injunctive relief awarded for Rancho's breach of the JVA. 297 S.W.3d 781, 783. The court held that there was no evidence supporting this relief and rendered judgment that Aquaplex take nothing. *Id.* at 783.

 The trial court's judgment declared that Rancho no longer had any interest in the joint venture because the interest was divested by one or more of: (1) the MSA; (2) an assignment of Rancho's interest in the joint venture to Omni-Bank; (3) paragraph 5.2(j) of the JVA;[3] or (4) paragraph 5.9 of the JVA.[4] We agree with the court of appeals that none of these is a proper basis for this relief. First, Aquaplex's counter-claim for declaratory and injunctive relief was premised on breach of the JVA, not the MSA. Sec-

ond, the unambiguous language of the "assignment" makes clear it was a security interest. It states that Rancho "assigns, transfers and conveys unto OMNIBANK ... all of Assignor's right, title and interest in and to Assignor's 40% ownership in [the joint venture] ... including, but not limited to all rights to cash and other distributions from the Venture." It states that "[t]his assignment is given in consideration of and as security for the payment of all the indebtedness ... owing by Assignor ... to Lender." It further provides that "[s]o long as there shall exist no default ... Assignor shall have the right to collect ... property and other distribution rights ... pursuant to the terms of the [JVA]." In addition, OmniBank would not be obligated to perform any duties or be obligated for any liabilities under the JVA and, upon default, OmniBank could notify the joint venture that all further distributions under the JVA shall be made to OmniBank. Lastly, it provided that, upon payment in full, the assignment was void. An "assignment" such as this, where the creditor does not assume any obligations and the effectiveness of the instrument is terminated on final payment, is a security interest. *See Amco Trust, Inc. v. Naylor,* 159 Tex. 146, 317 S.W.2d 47, 51 (1958). Nevertheless, we agree with the court of appeals that nothing in the record indicates OmniBank ever elected to exercise any rights it had under the "assignment" upon Rancho's default. Finally, relief can-

2. We do not reach the single injury issue or consider whether Aquaplex suffered more than one injury. An application of the single injury rule does not arise unless there is more than one recovery for a single injury. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 303 (Tex.2006). Under our holding, Aquaplex has only one recovery.

3. This provision in the JVA listed Aquaplex's authority as "managing venturer." It provided that Aquaplex is authorized to "[sell] all or

a portion of the Land or the Project for $60,000.00 per condominium unit or more."

4. This provision in the JVA discussed third-party offers. It provided that if an offer was made, a dissenting partner may buy out the other partner for the amount that partner would have made if the sale went through and the joint venture was immediately liquidated. Otherwise, the third-party offer shall be accepted.

not be premised on Paragraphs 5.2(j) and 5.9 of the JVA. Under 5.2(j), Aquaplex, as managing venturer, had a right to sell the property as long as the amount of the sale equaled $60,000 or more per condo. The Greenberg sale would have fit that description. Under 5.9, Rancho could have offered to buy out Aquaplex, but did not. There is some evidence that Rancho's actions prevented the Greenberg sale. But none of the contractual provisions cited by Aquaplex in the JVA or MSA explicitly supports a forfeiture of interest in the event of a breach. Forfeitures are not favored in Texas, and contracts are construed to avoid them. *See Sirtex Oil Indus., Inc. v. Erigan*, 403 S.W.2d 784, 787 (Tex.1966). Generally, the proper remedy for breach is damages. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex.1991).

■ As held by the court of appeals, the injunctive relief can no longer stand because there was *no evidence to support the* trial court's declaratory relief under the JVA. Thus, the denial of injunctive relief is proper as there was no threat of imminent harm. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 285 (Tex.2004).

■ While we agree with the court of appeals with regard to relief under the JVA, we do not agree with regard to the fraud claim under the MSA. The elements of fraud are:

(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

*In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex.2001) (citing *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998)). The court of appeals focused on the injury (or damages) element, holding that no evidence supported the damages awarded by the trial court. But first we consider whether, as Rancho argues, the intent element is not supported by legally sufficient evidence.[5] In reviewing a verdict for legal sufficiency, we "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005).

■ "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics*, 960 S.W.2d at 48. "Proving that a party had no intention

---

5. Rancho did not raise this alternative ground for affirmance as a cross-point in its response to the petition for review. It raised it for the first time in its brief on the merits. Aquaplex argues Rancho has waived this point. *See* Tex.R.App. P. 53.3(c)(2) (providing that the issues presented section in the response to the petition for review must include any "independent grounds for affirmance of the court of appeals' judgment"). Rancho's "Issues Presented" section did not assert that the court of appeals could have found no evidence supporting the intent element. But

Rule 53.4 of the Rules of Appellate Procedure provides: "[T]o request that the Supreme Court consider [points briefed in the court of appeals but not decided by that court], a party may raise those issues or points in the petition, the response, the reply, any brief, or a motion for rehearing." Tex.R.App P. 53.4. The court of appeals did not consider the intent element, but Rancho raised that issue before the court of appeals and its brief on the merits before this Court. Therefore, the point is not waived.

of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 305 (Tex.2006) (citing *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986)). While breach of the contract alone is not evidence that a party did not intend to perform, "breach combined with 'slight circumstantial evidence' of fraud" is some evidence of fraudulent intent, enough to support a verdict. *Id.* "[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric,* 708 S.W.2d at 434 (citing *Chicago, T. & M.C. Ry. Co. v. Titterington,* 84 Tex. 218, 19 S.W. 472, 474 (1892)).

██ Here, Rancho's attorney withdrew and then testified that he believed his client was perpetrating a fraud. The timing of the bankruptcy, filed just after the execution of the MSA, constitutes further circumstantial evidence of Rancho's lack of intent to perform. These examples satisfy the "slight circumstantial evidence" standard enunciated in *Tony Gullo Motors I* and *Spoljaric,* and when combined with Rancho's breach, establish the fraudulent intent requirement. *See, e.g., Tony Gullo Motors I,* 212 S.W.3d at 305–06 (breach plus spoliation of evidence and forged signatures met standard); *Spoljaric,* 708 S.W.2d at 435–36 (breach plus evidence that employer refused to commit bonus plan to writing and remained silent when asked if plan would be approved after it had already been approved met standard). Contrary to the court of appeals' conclusion, there is legally sufficient evidence to support a finding of fraudulent intent.

 The court of appeals held that no evidence supported the award of damages. 253 S.W.3d at 736. We disagree.

"Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure. The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." *Formosa Plastics,* 960 S.W.2d at 49 (citations omitted); *see also Baylor Univ. v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex. 2007) (per curiam) (observing that out-of-pocket damages "derive from a restitutionary theory," while benefit-of-the-bargain damages "derive from an expectancy theory").

The trial court entered judgment on the jury verdict, which awarded the following monetary damages: (1) $35,000 in attorney's fees and expenses incurred by Aquaplex as a result of Rancho's bankruptcy proceedings; (2) $597,183.70 as the amount Aquaplex lost due to Rancho's failure to permit a sale of the property after the execution of the MSA; (3) $100,000 as the amount Rancho was obligated to provide under the MSA; and (4) $279,000 as the amount that Aquaplex lost due to the loss of the OmniBank forbearance agreement. Under the benefit-of-the-bargain measure, Aquaplex suffered some damages under each of these categories.

Rancho argues that there is no evidence supporting a causal relationship between the alleged fraud and the $35,000 attorney's fees awarded in relation to the bankruptcy filing. But the bankruptcy delay was in direct contradiction to the purpose of the MSA—to end the litigation. The attorney's testimony that Rancho was consulting with bankruptcy counsel and that it did not intend to fund the $100,000 as it agreed in the MSA, along with the evidence of the bad faith bankruptcy filing is

legally sufficient evidence to support these damages.

■ Some evidence also supports Aquaplex's claim that it lost the benefit of the sale of the property due to Rancho's fraud. "Under the benefit-of-the bargain measure, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty." *Formosa Plastics*, 960 S.W.2d at 50. But the damages cannot be based upon an "entirely hypothetical, speculative bargain that was never struck and would not have been consummated." *Id.* "[D]etermining whether lost profits have been proved with reasonable certainty is a fact-intensive determination dependent upon the circumstances of a particular case," but "[w]hen a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Id.* at 50 n. 3. Here, there is some evidence that Aquaplex lost profits due to the fraud—specifically the loss of a sale to Greenberg. Greenberg offered $4.05 million for the property, which under the terms of the MSA, satisfied the minimum offer amount of $4 million. Rancho refused to consent to the sale and filed a *lis pendens*, effectively blocking the sale. The court of appeals held, and Rancho argues, that there is no evidence as to why the Greenberg Offer failed, and it is thus speculative to claim the alleged fraud caused its failure. But both parties testified that they knew of the Greenberg Offer, and Rancho testified that it filed the *lis pendens* to prevent the sale. This is sufficient evidence that the sale fell through due to Rancho's actions. Therefore, damages were proper.

■ The damages were calculated incorrectly, however. The jury and trial court awarded $597,183.70 for the loss of the sale. It appears from the record that this figure was reached by subtracting Aquaplex's original investment of $1,044,000 ($400,000 in contribution and $644,000 loan) from $1,641,183.70, which is the amount Aquaplex argued it was due (including interest) under the JVA had the property been sold to Greenberg. But this figure does not take into account that Aquaplex still received an interest in the property by way of its interest in the joint venture, which survived the failed sale under the Greenberg Offer. The damages figure must reflect this offset. *See Formosa Plastics*, 960 S.W.2d at 49–50. Therefore, the trial court's award was not proper and must be recalculated.

■ The trial court also awarded $100,000 for the OmniBank account Rancho failed to fund. The court of appeals held that there was no evidence that the money was to be paid to Aquaplex or that Aquaplex had to make the payments in lieu of Rancho. 253 S.W.3d at 736. Aquaplex argues that the $100,000 was a benefit-of-the-bargain, and that it was damaged by Rancho's failure to fund the $100,000 because the property remained encumbered with this amount. The court of appeals is partially correct: Rancho's failure to fund the $100,000 damaged the joint venture because its asset is encumbered by additional interest. Because of its ownership interest in the joint venture, Aquaplex was injured and may recover to the extent of that injury. This amount, though, would not necessarily be $100,000, and must be recalculated.

The court of appeals also held that the evidence did not support $279,000 in damages for the loss of the forbearance agreement because Aquaplex put on evidence of damages over a two-year period when the agreement at issue was only a one-year period. 253 S.W.3d at 735. The court of appeals is correct here. Aquaplex outlined the value of a two-year forbearance agreement in a chart at trial, but the agreement

introduced into evidence was only for one year. Thus, while there may have been damages, it was only for one year and Aquaplex failed to put on any evidence of the appropriate amount of damages for a one-year period.

■ We hold that some evidence supported an award of damages for fraud under the MSA, just not at the level awarded by the trial court. This Court may not order a remittitur, but the courts of appeals may. TEX.R.APP. P. 46.3; *Tony Gullo Motors I*, 212 S.W.3d at 310. Therefore, we affirm the portion of the court of appeals' judgment rejecting Aquaplex's declaratory and injunctive relief, and reverse the portion of the court of appeals' judgment related to the monetary damages. We remand the case to the court of appeals so that it may determine whether to remand for a new trial on damages, *see Formosa Plastics*, 960 S.W.2d at 51, or whether to suggest a remittitur, *see* TEX. R.APP. P. 46.3; *Tony Gullo Motors I*, 212 S.W.3d at 310. Furthermore, because we hold that actual damages were proper, the court of appeals must reconsider whether punitive damages are appropriate. *See Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex.1995) ("[A]ctual damages sustained from a tort must be proven before punitive damages are available."). The court of appeals must also consider the factual sufficiency issues raised by Rancho, but not yet addressed by the court of appeals. *See* TEX.R.APP. P. 53.4.