**Affirmed and Majority and Dissenting Opinions filed August 26, 2014**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00463-CV

### JAWED MANJLAI, Appellant

### V.

### NABILA HAMID MANJLAI, Appellee

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-44182**

## M A J O R I T Y   O P I N I O N

Following a jury trial, the trial court awarded Nabila Hamid Manjlai an annulment of her marriage to Jawed Manjlai. In this appeal, Jawed Manjlai contends the trial court's denials of his motions for judgment notwithstanding the verdict ("JNOV") and for new trial were improper because the evidence is legally and factually insufficient to support the jury's findings. We affirm.

BACKGROUND

Nabila is a citizen of the United States living in Houston, Texas. Jawed was born in Pakistan and came to the United States on a visitor's visa in October 2006. Nabila and Jawed were introduced to each other by a marriage broker retained by Jawed and his family. The two met in Houston in November 2007, and with the agreement of both families, were engaged in January 2008. Nabila agreed to sponsor Jawed for permanent United States residency (a "green card") after their marriage.

Nabila and Jawed were married by civil proceedings in Texas on February 1, 2008. Nabila filed a green card application for Jawed on February 6, 2008. In accordance with their faith, the parties married in the Islamic tradition on March 20, 2008. In February 2011, Jawed's green card application was approved. In July 2011, Nabila learned from others in her community that Jawed had terminated their marriage through a ceremony according to Islamic tradition.

Nabila filed this action in Harris County District Court in July 2011, seeking an annulment of her civil marriage to Jawed on the grounds that Jawed used fraud to induce her into the marriage. At trial, Nabila presented evidence to show that Jawed entered into the marriage solely as part of a scheme to obtain a green card for himself and to induce Nabila's family to provide various material benefits to himself and his family.

Testimony showed that Jawed and his family were in the United States illegally at the time they retained the marriage broker. Nabila testified that Jawed's family campaigned for a civil marriage immediately after the engagement, followed by filing a green card application. Jawed's family requested a six- to nine-month delay for the religious marriage, which Nabila's family rejected. After their religious marriage, Nabila moved with Jawed across the country to Boston,

then to Atlanta. Nabila testified that Jawed's parents moved in with them into their one-bedroom apartment in Boston shortly after the move.

Nabila testified that, during this time, Jawed never showed her any expressions of love. Furthermore, Nabila testified that Jawed never bought her flowers or presents. Nabila explained that it felt like they "were just roommates," and that Jawed's family would frequently whisper in other parts of the apartment where she was not able to hear. Due to frequent fighting and arguments between Nabila and Jawed's mother, Nabila expressed her desire to move back to Houston with her family. Shortly after Nabila filed a portion of Jawed's green card application that required proof of their residence together, Jawed bought Nabila a ticket to return to Houston alone.

The evidence also showed several episodes in which Nabila's family loaned money to Jawed's family that was never repaid, as well as jewelry that was never returned. Nabila and her father, Abdul Zakaria, testified that, according to Pakistani tradition, the Zakaria family advanced a $20,000 loan to the Manjlai family to pay for their portion of the wedding costs. Shortly after the civil wedding ceremony, Jawed was detained by Immigration and Customs Enforcement officials. Abdul testified that the Zakaria family loaned $16,500 to the Manjlai family for attorney's fees, a bond deposit, and filing fees on Jawed's behalf with the expectation and assurance that these sums would be repaid. As part of the Islamic wedding ceremony, the Zakarias entrusted Jawed's mother with over $25,000 in gold jewelry that belonged to Nabila. At the time of trial, none of the above amounts had been repaid and none of the jewelry had been returned to Nabila or the Zakaria family.

Evidence at trial showed that Nabila had applied for a student loan from Chase Bank about sixth months after the marriage, but Jawed later told Nabila she

3

had been denied the loan. Nabila testified that she subsequently learned the loan had been approved for $2,500, although Jawed had cashed the check without telling her.

After Jawed's green card application was approved in February 2011, he traveled from Atlanta to Houston to retrieve the card from Nabila and her family. While Jawed was in Houston, Abdul Zakaria directed him to bring back or replace Nabila's gold, to repay money that was loaned to the Manjlai family, to ensure his parents moved home to Pakistan, and to be a better person. Similarly, Nabila asked Jawed to sign a hand-written contract stating that, among other things, Jawed would never lie to Nabila and would never apply for a green card for his family members. Nabila threatened to leave the marriage if Jawed did not comply with this new set of promises. Jawed signed the document on July 5, 2011. Nabila testified that Jawed avoided picking up her calls for the next five days. Text message conversations in the record reflect that Jawed repeatedly assured Nabila that he would meet Abdul Zakaria's demands.

Nabila testified that Jawed texted her on July 10, 2011, stating "it's all over." Three days after the text, Nabila learned through a community member that Jawed had divorced her according to Islamic tradition. Nabila testified that her reputation was damaged in her community when Jawed divorced her. Furthermore, Nabila testified that she first realized the marriage was a fraud when Jawed divorced her without explanation.

Finally, testimony revealed that Jawed had discussed marriage and a subsequent green card application with another woman, Anam Syed, shortly before he agreed to marry Nabila. Syed testified that she met Jawed through an online dating website, and had informally agreed to marry him before his engagement to Nabila. Additionally, Syed testified that Jawed understood she was an American

4

citizen, and that the two spoke "in detail" about the possibilities of Syed petitioning for Jawed's green card. Testimony at trial showed that neither Jawed nor his family disclosed to Nabila that Jawed was informally engaged to Syed.

At the end of the trial, the jury reached a verdict determining Jawed had used fraud to induce Nabila into the marriage and that Nabila had stopped cohabitating with Jawed after discovering the fraud. Jawed's motions for a JNOV and for a new trial were denied. This appeal followed.

ISSUES AND ANALYSIS

Jawed contends that the evidence is legally and factually insufficient to support the trial court's denial of his motion for JNOV and motion for new trial. Because Jawed has not preserved error as to his factual sufficiency argument, we address only his legal sufficiency argument.

## I.      Standard of Review and Applicable Law

The trial court's denial of a motion for JNOV is reviewed under a legal sufficiency standard. *Manon v. Solis*, 142 S.W.3d 380, 387 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). When reviewing a trial court's ruling on a motion for new trial, we generally apply the abuse-of-discretion standard. *Memon v. Shaikh*, 401 S.W.3d 407, 416 (Tex. App.—Houston [14th Dist.] 2013, no pet.). But if, as in this case, the motion for new trial is based on a challenge to the sufficiency of the evidence supporting the verdict, then we review the trial court's denial of the motion by applying the standard of review that corresponds to the sufficiency challenge. *Id*. A complaint of factual insufficiency of the evidence to support a jury finding must have been raised in a motion for new trial. *See* Tex. R. Civ. P. 324(b)(2) and (3); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex. 1991). Here, Jawed's motion for new trial alleges only that there is no evidence to support the jury's verdict; it does not raise any issue regarding the factual sufficiency of the evidence.

5

Therefore, Jawed has failed to preserve his factual sufficiency issue and we do not address it.

The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not. *Id.* Because jurors are the sole judges of the credibility of witnesses and may choose to believe one witness and disbelieve another, we must not substitute our opinion for that of the jury. *See id.* at 819. It is the role of the jury to resolve conflicts in the evidence; accordingly, we must review the evidence in a light favorable to the verdict and assume that jurors resolved all conflicts in accordance with that verdict. *Id.* at 820.

Fraudulent inducement is established by proving that a false material representation was made that was known to be false when it was made, was intended to be acted upon, was relied upon, and caused injury. *Leax v. Leax*, 305 S.W.3d 22, 29 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A promise of future performance is actionable as a false representation if the promise was made with no intention of performing at the time it was made. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam) (citations omitted). While breach of a contract alone is not evidence that a party did not intend to perform, breach combined with slight circumstantial evidence of fraud is enough evidence to support a verdict for fraud. *Id.* at 775. A party's intent is determined at the time the party made the representation, but it may be inferred from the party's subsequent acts after the representation is made. *Id.*

6

## II.     Analysis

At the conclusion of trial, the jury found that Jawed used fraud to induce Nabila into the marriage and that Nabila did not voluntarily cohabitate with Jawed after realizing the fraud. Pursuant to section 6.107 of the Texas Family Code, the trial court entered a judgment granting Nabila an annulment of the marriage. Section 6.107, entitled "Fraud, Duress, or Force," provides:

> The court may grant an annulment of a marriage to a party to the marriage if:
>
> (1) the other party used fraud, duress, or force to induce the petitioner to enter into the marriage; and
>
> (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud or since being released from the duress or force.

Tex. Fam. Code § 6.107.

Jawed first asserts that there is no evidence to support the jury's verdict because: (1) all of the alleged false representations occurred during the marriage, not before, and therefore cannot support a claim for inducement; and (2) the evidence established that Nabila continued cohabitating with Jawed after discovering the alleged fraud. Furthermore, Jawed contends that all previous Texas cases in which annulments were granted are "based on some objective facts," and this case presents no such objective facts.

Our review of the record reveals legally sufficient evidence from which a reasonable juror could infer that Jawed used fraud to induce Nabila into marriage. Even though Jawed contends that any false representations were made during, rather than before, the marriage, the record reveals circumstantial evidence from which a jury could infer that Jawed made false representations intended to induce Nabila into executing the civil ceremony. *See Aquaplex*, 297 S.W.3d at 775

("While breach of the contract alone is not evidence that a party did not intend to perform, 'breach combined with slight circumstantial evidence of fraud' is some evidence of fraudulent intent, enough to support a verdict."). Jawed's insistence on a green card application, his refusal to pay back various loans, and his informal engagement with another woman with whom he discussed obtaining a green card immediately before his engagement to Nabila all support the conclusion that Jawed only intended to marry Nabila for reasons other than fulfilling his marital vows. This conclusion is also supported by Jawed divorcing Nabila by Islamic tradition soon after he obtained his green card. Thus, the jury reasonably could infer that Jawed's marriage vows, i.e., promises to remain married for life, were false representations at the time he made them. Similarly, the jury reasonably could infer that Jawed made representations that were intended to be acted upon, were known to be false when he made them, and caused injury to Nabila in the form of grief and lost reputation.

Jawed further contends that the evidence established that Nabila continued to cohabitate with Jawed after discovering the alleged fraud and, therefore, the evidence is insufficient to support the jury's verdict. On cross-examination, opposing counsel asked Nabila if she continued living with Jawed after she discovered that Jawed "lies and hides things," which she alleged was a fraud. Nabila answered affirmatively. Furthermore, Nabila answered affirmatively that she "discovered what [she calls a] fraud but [she] chose to continue living as a wife with [Jawed.]" She later clarified her position, though, stating that she "didn't know at the time" about the "green card fraud," and that she only realized Jawed married her for a green card when Jawed divorced her by the Islamic tradition. Nabila's clarification was consistent with her testimony on direct-examination, when she testified that she realized her husband married her only for the green card

8

"when I found out he divorced me."

Although Jawed contends that Nabila's testimony conclusively established that she voluntarily cohabitated with him after discovering the fraud, Nabila's later testimony conflicts with that conclusion. Viewing the evidence in a light favorable to the verdict, we must assume that the jurors resolved all conflicts in accordance with the verdict. *City of Keller*, 168 S.W.3d at 820. Here, the jury could resolve any conflicts in her testimony by determining that Nabila discovered many of Jawed's lies during the marriage, yet she was never aware of the entire fraud regarding the green card until after Jawed divorced her. By the time Jawed divorced Nabila, the couple was not cohabitating. Thus, the evidence is sufficient to support the jury's conclusion that Nabila did not cohabitate with Jawed after discovering the fraud.

Finally, Jawed asserts that we should reverse the trial court's decisions because Nabila threatened to leave the marriage if Jawed did not sign an agreement stating that, among other things, Jawed would not lie to Nabila nor apply for a green card for any of his family members. Jawed contends that, "there is no Texas law . . . where the party threatening divorce and making written demands upon the other party has ever successfully been granted an annulment." Nowhere in Jawed's appellate brief does he explain why the agreement he signed with Nabila should render the evidence legally insufficient, and we do not determine this fact is controlling. The fact that Nabila attempted to repair the marriage by demanding that Jawed change his behavior has no bearing on whether Jawed made false representations intended to induce Nabila into the marriage in the first place.

Given the circumstantial evidence tending to show Jawed's intent not to perform his obligations under his marital vows and Nabila's testimony that she did not discover the fraud until after she and Jawed had separated, we determine

9

legally sufficient evidence exists to support the jury's findings. *See Aquaplex*, 297 S.W.3d at 775.

We overrule Jawed's issues and affirm the trial court's denial of his motions for JNOV and new trial.


/s/     Ken Wise
                Justice


Panel consists of Chief Justice Frost and Justices Jamison and Wise (C.J. Frost, dissenting).