

# NUMBER 13-24-00516-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

KATHERINE YORK
AND TYLER YORK,                                    Appellants,

v.

JEANNETTE YORK,                                    Appellee.

## ON APPEAL FROM THE COUNTY COURT AT LAW
## OF WALKER COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Peña and West
Memorandum Opinion by Chief Justice Tijerina**

Appellants Katherine and Tyler York (collectively the Yorks) appeal a judgment in

favor of appellee Jeannette York for breach of contract, promissory estoppel, and fraud.

By seven issues, the Yorks contend the verdict should be reversed as to all causes of

action and the damages awarded of $122,550.[1] We affirm.[2]

## I. THE EVIDENCE

### A. Estrangement and Reconciliation

Jeannette testified that she and Ronald J. York were married for almost fifty years, and they had two children, Tyler and a daughter. Jeannette and Ronald built a home in Huntsville, Texas. Jeannette said she and Ronald had not been "close" to her son, Tyler, prior to Ronald's death, and Tyler had not visited for "many years." Tyler testified that he was estranged from Jeannette from 2012 until 2018. However, after Ronald died in 2018, the family was reunited. Jeannette stated that Tyler inquired about receiving his inheritance from Ronald early, but Ronald did not have a will. Tyler believed that Ronald had a will. Tyler did not receive any inheritance from Ronald.

### B. Jeannette Agrees to Move to the Yorks' Property

On June 9, 2019, Tyler sent Jeannette an email asking Jeannette to move in with them, suggesting a realtor to sell her home that he had already contacted, and stating that the family was "excited" about Jeannette moving in with them. Katherine, Tyler's wife, stated that they "agreed" that if Jeannette built an apartment on the Yorks' property, she could live there for life. Jeannette sold her home in Huntsville in July 2021, and Jeannette moved into the Yorks' home during construction of the apartment. Jeannette testified that when she arrived, there was a welcome home sign, balloons, and bouquets.

---

[1] We need not address the Yorks' issues challenging the sufficiency of the evidence supporting the other theories of recovery, including breach of contract and promissory estoppel, because as further explained below, we find that the jury's finding of fraud supports the judgment, and it should be affirmed on that basis. *See* TEX. R. APP. P. 47.1; *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 870–71 (Tex. App.—Dallas 2008, no pet.) ("When the judgment rests on multiple theories of recovery, we need not address all causes of action if any one theory is valid.").

[2] This appeal was transferred to this Court from the Tenth Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE § 73.001.

Jeannette used her grandson's bedroom. Katherine explained that tensions arose when Jeannette scolded her granddaughter about her slippers, Jeannette grabbed her grandson by his shirt causing him to cry, and Jeannette ignored one of her granddaughters causing her to ask, "Why doesn't grandma love me?" Jeannette testified that she had never "singled" out her granddaughter.

Tyler complained that when Jeannette lived with the family she stayed in her room, he would have to call her for dinner, she did not clean her plate after dinner, and she would "constantly" call Tyler into her room while he and Katherine tried to get the children ready for bed. Tyler testified that he had become "[f]rustrated with being lied to and being manipulated and seeing how she treated [his] family." Tyler's trial counsel asked, "What did she lie to you about?" Tyler responded, "Just the situation that she was in . . . Huntsville that led us to believe that she had poor quality of life here. The story that nobody was here to take care of her, look out for her. She had nobody else to turn to" and "didn't know how to balance a checkbook on her own."

## C.     The Contract with Jones and Payments

Katherine testified that eleven days after Jeannette wired $35,000 to them in May 2021, the Yorks entered a contract with Dennis Jones to work on several projects on the property, which included building an approximately 600-square-foot apartment for Jeannette costing $72,000. The contract included, among other things, "items related to the exterior of the existing house," costing $42,660. Katherine said an addition of a basement would be used as a tornado shelter that benefited the entire family. Katherine said Jones gave an estimate of $41,600 to add a master suite, but they chose not to make that addition.

3

Jeannette claimed that she signed a contract to build the apartment but that the Yorks would not give her a copy of it. Jeannette testified that the Yorks' portion of the contract would have been $46,075, and they did not pay Jones that amount. Jeannette testified that Jones also agreed to perform work on the exterior of the Yorks' home, such as, among other things, replacing all the windows and putting siding on the home.

Tyler signed a contract with Jones. Tyler testified that Jones was performing additional work for them aside from the apartment such as, among other things, replacing windows, installing a septic tank, installing siding, improving gutters, and making a basement, which was an additional $15,480. Tyler acknowledged that they paid Jones using the money that Jeannette gave them and claimed the Yorks contributed some of the funds. According to Tyler, the Yorks planned on paying for part of the basement, the gutters, the septic tank, part of the patio, and for construction of a barn. Tyler did not know how much the Yorks paid for the work. Construction began in August 2021.

Jones testified that on May 31, 2021, he contracted with Tyler to build an approximately 600-square-foot apartment, which included a "breezeway built in between" the Yorks' home and the apartment. Jones stated that he also contracted with Tyler to build a new master bedroom for $41,600. Jones said the entire project, which included building a basement, among other things, would cost approximately $150,000. Jones said that he "bought a bunch of material" with a down payment from Tyler to add the master bedroom. Jones did not make that addition because Tyler did not "have the money to complete it."

Documents admitted at trial show that the Yorks received $35,000 on May 20, 2021, from Jeannette; Tyler wrote a check to Jones for $25,000 on May 31, 2021;

4

Jeannette wrote a check for a "Draw" to Jones for $15,000 on September 3, 2021; on December 6, 2021, $40,000 was transferred from Jeannette to the Yorks; on December 12, 2021, Jeannette wrote a check to Jones for a "Draw" for $20,000; on December 22, 2021, Katherine wrote a check to Jones for $8,750, with the memo, "Patio payment"; and on January 18, 2021, Jeannette wrote a check to Jones for $8,750 for the "South Patio East End." Tyler and Katherine did not dispute that Jeannette sent the Yorks $75,000 for construction of the apartment. The record contains copies of four checks that Katherine wrote to Jones for (1) $25,000 on May 1, 2021, (2) $8,750, with the memo, "Patio payment," on December 22, 2021, (3) $31,000 with the memo, "Addition" on January 29, 2022, and (4) $2,000 with the memo, "Kitchen-paid in full," on May 4, 2022. The trial court also admitted the carbon copy receipt of a check made out to Jones for $11,000 on August 8, 2021. The signature is obscured.

Jones agreed that Jeannette gave him $15,000 in September 2021, $20,000 in November 2021, $605.43 in December 2021, and then $8,750 in January 2022. Jones also agreed that adding the $75,000 Jeannette gave to the Yorks, she made payments totaling $119,355.43. Jeannette's trial counsel stated that the Yorks have each "testified that you have Jeannette's . . . money. Do you have any of Jeannette's . . . money?" Jones replied, "[T]hey got a house, and I did the work for her, and I got paid for the work." Jones testified that Tyler said, "[Jeannette] wouldn't give him anymore money" for an addition. Jones claimed that the Yorks owe him money for "work in the kitchen." Jones accused the Yorks of "lying" and insisted that they did not pay for certain work he performed. Eventually, Jones "quit" because the Yorks did not pay him as agreed. Jones had "a lot of doubts" that the Yorks were "honest people."

**D.      The Dispute Over $40,000**

Jeannette added Tyler and Katherine to a bank account and claimed that Katherine made an unauthorized transfer of $40,000 from that account to the Yorks' account on December 6, 2021, which Jeannette asked Katherine to return. Katherine denied she transferred the money and claimed Jeannette had done so. Subsequently, Jeannette went to stay with her sister, Joyce McGalin, because McGalin was having surgery. Jeannette testified she intended to live in the apartment after helping McGalin.

The trial court admitted text messages sent on January 19, 2022. In one message Jeannette asked "what the hold up [was] on putting" the $40,000 back in her account and stated the Yorks should return the $40,000 because Jones would not start the work for two weeks, she wanted the money to continue to earn interest in her bank account, so she wanted to report the transaction to her accountant. Tyler disagreed and stated, "considering your recent actions, we are not confident you have not made the choice to walk away, thus putting us in a financial situation where we are left to finish paying the construction cost for your build. . . . As such the funds will remain where they are." Jeanette said, "I have and continue to pay for all costs related to the apartment. You are not paying for anything related to that," and "When did I ever say I was/am walking away? Stop making accusations that I have not said. Whatever you think my actions are, I cannot control." The Yorks did not respond, and they did not return the $40,000.

**E.      The Lock-Out Incident**

On February 1, 2022, Jeannette went to the Yorks' home to pick up some of her belongings, but the locks had been changed. Katherine claimed that the Yorks changed the locks because they became concerned that Jeannette would not pay to complete the

6

apartment. Tyler gave a different reason stating, "We changed the locks on our house because [Jones] had verbally assaulted my wife multiple times, and he also had a key to our home for the construction to be built," and "we" felt unsafe while Jones had a key. Tyler agreed that, prior to February 1, 2022, he did not inform Jeannette that the locks had been changed, that she was not welcome to come back, and he did not give her a key because according to Tyler, "there was no communication."

Tyler also stated that Jeannette decided to leave, and "[s]he wasn't consistent in the agreement by living in the property. She had already packed her things and left." Tyler believed that Jeannette "breached the agreement by packing all her things when my children came and told me the room was completely empty, so we were left to assume that she was gone." Tyler said, "And following a month of . . . zero communication from her, it was a further confirmation for us that we had no idea when she would be returning."

Jeannette testified that the Yorks called the police to escort her and McGalin off the property, and she felt unwelcome that day. McGalin believed that "[i]n retrospect" Tyler and Katherine "had this planned" and that it "was their intent all along to take Jeannette's money and use it for themselves." Two videos taken that day were played for the jury during the testimony of the witnesses.

Tyler did not "recall" telling Jeannette on February 1, 2022, that she was "no longer welcome on the property." However, after viewing the video of the incident admitted into evidence, Tyler agreed that he had done so. Tyler claimed that he did not hear Katherine tell Jeannette that she was not welcome on their property, so the video was replayed. Tyler responded, "Oh, yes, I recall now." Tyler denied that he called the police to remove Jeannette from the property; he said, "I called the police to remove [McGalin] from the

7

property. We asked [McGalin] to leave." Jeannette's trial counsel replied, "And you'd ask [Jeanette] to leave as well?" Tyler stated, "In the videos you played, yes. But initially, no." Tyler acknowledged he told Jeannette she was not allowed on the property, had the police escort her off the property, told her never to return, and said she would forfeit any belongings she could not remove from the property. Katherine said she told Jeannette that she would forfeit any belongings she did not take "because I didn't want her to come for the safety of my kids. I mean, honestly . . . Yeah, we would have let her come."

Neither Tyler nor Katherine told Jeannette after the lock-out incident that she was welcome to move into the apartment. The Yorks explained they were unable to contact her due to the attorneys' instructions. When asked if he should return Jeannette's money, Tyler replied, "I don't have her money." Katherine stated that it was her "position" that Jeannette could still live on the property and denied she told Jeannette she could not live on their property, was not welcome, and was trespassing. The videos were played showing Katherine telling Jeannette and McGalin to leave. Jeannette's trial counsel said, "It certainly doesn't sound like she's got the ability to use the property whenever she wants; correct?" Katherine stated, "At that point, correct." Jeannette's trial counsel asked, "So now it's your testimony that she's not allowed there; correct?" Katherine responded, "No. I mean, if she wanted to come back tomorrow and me closed the door, she's more than welcome to come back. But in this situation where we were at—." Jeannette's trial counsel queried, "So are you telling the ladies and gentlemen of the jury that that means that she can still live there whenever she wants to?" Katherine said, "In a perfect situation, without the current circumstances that we were at right now, yes." Jeannette's trial counsel responded, "I'm not talking about a perfect situation. I'm talking about when an

8

agreement is made to be able to live at a place in exchange for paying over $75,000 for work to be done on a place, how is it that it has to be the perfect circumstances for her to continue to live there?" Katherine said, "Because she left. Like, we didn't ask her to [leave;] we didn't kick her out. She left. So are we just supposed to allow her to come stay in our son's room whenever she wants?"

When asked why she had previously testified that she did not accuse Jeannette of trespassing, Katherine replied, "Well, it was [McGalin] that we had asked to leave." Katherine acknowledged that the video shows her telling a police officer that Jeannette is trespassing and asking the officer to make Jeannette and McGalin leave. Katherine agreed that the Yorks made it clear that Jeannette was not "welcome" on the property and their behavior was inconsistent with "allowing her to live there for a lifetime." Jeannette agreed with her trial counsel that Katherine had been untruthful when she said she had not told Jeannette to leave that day. Video depositions played for the jury show the Yorks each claiming that Jeannette was welcome to live on the property. However, according to Jeannette, neither Tyler nor Katherine told her that she was able to move into the apartment after the lock-out incident.

## F.     The Yorks Attach the Apartment to Their Home

When asked when the Yorks decided the apartment would be used their master bedroom, Tyler said, "it was shortly after hearing that [Jeannette] had already lawyered up that my wife and I had had a conversation about needing to do something with that extra living space to make it not open to the elements and enclose it." Jones stated Tyler told him to connect the apartment to his home "around the last of January" 2022, and the addition consists of a sun room connecting the apartment to the home, which is "around

9

200 square feet," the master bedroom and bathroom, which is 660 square feet, a basement of about "12 by 20," a porch, which is "12 foot by about 50, 60 foot, and then there's a two-car carport out front with . . . [an] 8 by 20 little side porch." Jones said the home's value increased by "[p]robably $150,000." Tyler agreed he used Jeannette's money "to finish the building project" in February 2022. Tyler testified the apartment was attached "to ma[k]e it inhabitable" and agreed they now have a master bedroom, bathroom, basement, and carport.

Katherine explained that Jones wanted to sue them because Jeannette owed him $40,000, so the Yorks gave him the money. Katherine claimed Jones came up with the idea of attaching the apartment to their home because they had previously given Jones $12,500 to build their master bedroom, and they could not pay him to complete it. Katherine said, attaching the apartment to the home "would resolve us getting sued, because then he would put it within the budget that he had already been paid according to what he thought was owed." Katherine stated that Jones "opened up the kitchen to connect" the apartment to the home.

Katherine did not believe that the Yorks prevented Jeannette from living in the apartment. Jeannette's trial counsel asked, "[I]f you take the space of the [apartment], it makes it hard for [Jeannette] to live there; true?" Katherine replied, "I don't know how to answer your question. I guess I'm not understanding. It's more of a statement than a question." Jeannette's trial counsel said, "If you're living in the space that was designated for her, it makes it more difficult, if not impossible, for her to live there: correct?" Katherine replied, "It's not impossible. If we shut the kitchen." Katherine agreed with Jeannette's trial counsel that they could not all live in the new master bedroom, and stated, "But if you

close the kitchen off, she would have her [apartment], and we would have our side of the house, like our own room." Tyler did not agree that it would be difficult for Jeannette to live on the property because the Yorks could "move out" of the master bedroom, and he would "be willing" to allow her to live in that part of the house.

## G.    Jeannette Retrieves her Belongings

On March 20, 2022, Jeannette sent an email to Tyler asking about retrieving her belongings. Tyler responded, "To be clear, no one except you and the movers are allowed on our property . . . . I will ensure that the authorities are here to enforce this." On March 31, 2022, Tyler sent an email to Jeannette stating, "Should you fail to have the mover obtain the remainder of your belongings by the aforementioned time and date, they will be considered abandoned and thus forfeited." Jeannette paid $3,350 to the movers. A video taken on April 6, 2022, when the movers retrieved Jeannette's belongings was played. According to Jeannette, the video shows that the apartment had been attached to the Yorks' home. The Yorks told Jeannette not to come back or send gifts.

## H.    The Yorks' Refusal to Pay Jeannette

The Yorks refused to pay Jeannette for any of the construction. When asked if he should return Jeannette's money to her, Tyler replied, "I don't have her money." Tyler acknowledged that the Yorks paid for the construction on the property with Jeannette's money but claimed the Yorks contributed some of the funds.

Katherine stated they would not pay Jeannette despite living in the structure she paid to construct. Jeannette's trial counsel asked, "[Y]ou think you just get to keep her money and use her space because you can?" Katherine said, "No." Katherine testified that the Yorks would not have built a carport, basement, patio, and breezeway if Jeannette

11

had not wanted them. Katherine denied that she and Tyler were "trying to hoodwink" Jeannette. Katherine said, "It looks like it, but we didn't." Tyler's trial counsel asked if he had concocted "a scheme to get some money that [Jeannette] made out of the sale of her home?" Tyler said, "Absolutely not." Tyler's trial counsel stated, "It sure looks like it?" Tyler replied, "I understand that could be perceived, but that wasn't the case."

## II.    SUFFICIENCY OF THE EVIDENCE

By their first issue, the Yorks contend the evidence is legally and factually insufficient to support the jury's finding that they committed fraud because there is no evidence "showing the York's intent not to perform." Specifically, the Yorks state that "the record contains ample evidence showing their original intent for Jeanette to live on their property in an apartment she built but the circumstances had changed." The Yorks do not challenge the other elements of fraud.[3] By their second issue, the Yorks challenge the award of $122,550  awarded in damages.

## A.    Standard of Review

A "no evidence" or legal insufficiency challenge is a question of law challenging the sufficiency of the evidence to support a particular fact finding. *In re Est. of Livingston*, 999 S.W.2d 874, 879 (Tex. App.—El Paso 1999, no pet.). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the verdict, crediting any favorable

---

[3] "The elements of fraud are (1) a material false representation, (2) that was made with knowledge or recklessness as to its falsity, (3) with the intent to induce reliance, and (4) that the other party 'actually and justifiably relied upon,' causing him injury." *Garcia v. Vera*, 342 S.W.3d 721, 725 (Tex. App.—El Paso 2011, no pet.) (first citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001) and then citing *Wil–Roye Inv. Co. II v. Wash. Mut. Bank, FA*, 142 S.W.3d 393, 411 (Tex. App.—El Paso 2004, no pet.)).

evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id*. at 821–22, 827. If the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the factfinder. *Id.* at 822.

"In reviewing a factual-sufficiency challenge to a jury finding on an issue on which the appellant did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust." *Editorial Caballero, S.A. de C.V. v. Playboy Enters., Inc.*, 359 S.W.3d 318, 329 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). We examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).

Whether reviewing the legal or factual sufficiency of the evidence, the jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We must show deference to the jury's resolution of conflicts in the evidence, and we must presume that the jury resolved all conflicts in favor of the verdict. *City of Keller*, 168 S.W.3d at 820–21. We may not substitute our own judgment for that of the jury, even if we would reach a different answer based on the evidence. *GTE Mobilnet of S. Tex. Ltd. P'ship*, 61 S.W.3d at 616 (citing *Mar. Overseas Corp.*, 971 S.W.2d at 407).

## B.    Misrepresentation

13

We measure the sufficiency of the evidence based on the jury charge when there is no objection. *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). The jury charge asked, "Did Katherine York/Tyler York commit fraud against Jeannette York," listed the elements of fraud, and defined "misrepresentation" as "a false statement, a promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or a statement of opinion based on a false statement of fact or a statement of opinion that the maker knows to be false."

"[W]hen one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). "Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774–75 (Tex. 2009) (citation modified). "While breach of the contract alone is not evidence that a party did not intend to perform, breach combined with slight circumstantial evidence of fraud is some evidence of fraudulent intent, enough to support a verdict." *Id.* at 775. (citation modified). "[A] party's intent is determined at the time the party made the representation, [but] it may be inferred from the party's subsequent acts after the representation is made." *Id.*

The evidence provided that Tyler had been estranged from his parents prior to Ronald's death, and Tyler began questioning the amount of money he would get when Ronald died. Tyler believed that Ronald had a will even though Jeanette stated he did not. The jury heard that after discovering that he would not get an inheritance, Tyler encouraged Jeannette to sell her home and pay to build an apartment on his property

14

and that Jeannette agreed to do so. Evidence was presented that Jeannette did not authorize Katherine to transfer $40,000 to her account and that Katherine and Tyler refused to return the money to Jeannette. The evidence shows that Jeannette paid $119,355.43 for a contract that cost $72,000.

The Yorks locked Jeannette out of the apartment on February 1, 2022, and they gave conflicting reasons as to why. Jones testified that Tyler told him to attach the apartment to his home in January 2022, prior to the lock-out incident. The Yorks called the police claiming that Jeannette was trespassing although they had $40,000 of Jeannette's funds to complete the construction of the apartment. There is nothing in the record showing that Jeannette refused to pay Jones at any time during the construction or that she had breached the agreement to pay for the apartment. Instead, there is evidence that Jeannette gave the Yorks $75,000 and paid Jones approximately $44,000, which is way above the estimated cost for construction of the apartment of $72,000. The jury could have reasonably inferred from this discrepancy that Jeannette paid for expenses that the Yorks had agreed to pay. The jury could have further inferred that the Yorks then used Jeannette's money to attach the apartment to their home instead of completing the apartment, even though Jeannette had already paid $44,000 over the estimated costs of construction. They then began using what should have been Jeannette's apartment as a master bedroom, even though they agreed Jeannette could live in it for life.

The Yorks' veracity was challenged at trial by not only statements from Jeannette, Jones, and McGalin, but it was established that both Tyler and Katherine had been untruthful when, among other things, they claimed they had not told Jeannette she was

15

not welcome and did not accuse her of trespassing. McGalin further testified that she believed the Yorks "had this planned" and that it "was their intent all along to take Jeannette's money and use it for themselves." Tyler's trial counsel said, "[i]t sure looks like" Tyler had concocted "a scheme to get some money that [Jeannette] made out of the sale of her home?" Tyler replied that he "understood that could be perceived." Katherine agreed that "[i[t looks like" they were "trying to hoodwink" Jeannette. Jeannette also believed that they "tricked" her.

There is evidence that the Yorks were responsible for paying for their portion of the construction, and there is no evidence that they used their own funds to make such payments, but Jones completed the work. Thus, the evidence leads to a reasonable inference that the Yorks used Jeannette's money to pay for improvements to their own home that they had agreed to pay, including attaching the apartment to their home.

Considering the evidence favorable to the jury's finding that Tyler and Katherine made a misrepresentation to Jeannette at the time of the agreement,  and disregarding the evidence contrary to the finding, we hold that more than a scintilla of evidence supports the fraudulent intent requirement. *See Aquaplex, Inc.*, 297 S.W.3d at 775. Moreover, after considering and weighing all of the evidence in the record pertinent to the fraudulent intent finding, we hold that the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the jury's answer should be set aside and a new trial ordered. *See Cain*, 709 S.W.2d at 176. We overrule the Yorks' first issue.

## C.    Damages

By their second issue, the Yorks contend that $122,550 awarded in damages is

16

not supported by legally and factually sufficient evidence. Specifically, the Yorks argue that "even if the $35,000, $20,000, $15,000, and $8750 payments Jeannette made to the Yorks, Dennis Jones, and Jones Construction were solely the result of the agreement to build her apartment, the record shows that her actual damages would have been $78,750." The Yorks state, "Although Jeannette made a $605.40 payment solely because she did not like the doors Jones Construction included, it was not based on the Yorks' agreement," and "her moving costs were also not related to Jeannette's apartment agreement because the apartment was not yet completed."

There was evidence that Jeannette gave the Yorks $75,000, and Jones testified that adding the $75,000 to the amount she gave him, Jeannette paid $119,355.43 for the construction. Jeannette also paid $3,355 to move her belongings after the Yorks locked her out. Adding these amounts equals $122,710.43, and the jury awarded $122,550.

Next, the Yorks argue moving expenses are not recoverable; however, Jeannette is entitled to actual damages which can be either direct or consequential. *Samson Lone Star Ltd. P'ship v. Hooks*, 497 S.W.3d 1, 19 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Consequential damages "result naturally but not necessarily from the wrongful act" and are recoverable "if the losses are foreseeable and directly traceable to and result from misconduct." *Id.* Here, the jury could have reasonably found that Jeannette's moving expenses were the foreseeable and a direct result of the Yorks' fraud. *See id.*

Having considered evidence favorable to the jury's finding of damages if a reasonable factfinder could and having disregarded evidence contrary to the finding unless a reasonable factfinder could not, we hold that more than a scintilla of evidence supports the amount awarded. *See Aquaplex, Inc.*, 297 S.W.3d at 775. Moreover, after

considering and weighing all the evidence in the record pertinent to the damages finding, we hold that the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the jury's answer should be set aside and a new trial ordered. *See Cain*, 709 S.W.2d at 176. We overrule the Yorks' second issue.

### III.     ELECTION

By what we have renumbered as their third issue, the Yorks state, without citation to appropriate authority, "[Jeanette's] failure to elect a theory requires a remand to the trial court." However, the Texas Supreme Court has stated, "[W]here the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the greater recovery and render judgment accordingly." *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) (noting that a prevailing party is "entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict"). Therefore, remand is unnecessary because the trial court here rendered the judgment utilizing the findings affording the greater recovery despite Jeannette's failure to elect. *See id.*

The Yorks next argue that the trial court erred because it did not specifically state that it had awarded the damages based on the fraud theory. They say, "One could surmise this was the court's decision but there is no clear indication provided by the court. The court could have awarded actual damages for the breach of contract and then exemplary damages for the fraud claim." We disagree. The jury awarded the same amount for breach of contract and fraud, $122,550. Moreover, in the final judgment, the

18

trial court included an award of $122,550 plus exemplary damages, which the jury only awarded for the fraud cause of action. Therefore, the trial court clearly awarded damages for fraud in the judgment. *See* TEX. CIV. PRAC. & REM. CODE § 41.003 (providing exemplary damages may only be awarded "if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from," fraud, malice, or gross negligence). We overrule the Yorks' third issue.

## IV.  CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
19th day of February, 2026.