ACCEPTED
01-13-00738-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
4/17/2015 1:46:08 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-13-00738-CV

_____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
4/17/2015 1:46:08 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE FIRST COURT OF APPEALS

_____

## CHRIS WILMOT,
### Appellant

## V.

## HARRY A. BOUKNIGHT, JR.
### Appellee

FROM CAUSE NO.: 2010-00373;
*Harry A. Bouknight, Jr. v. WCW International, Inc. and Chris Wilmot*

## IN THE 295TH JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

---

## APPELLANT CHRIS WILMOT'S MOTION FOR *EN BANC* REHEARING

---

Michael M. Essmyer, Sr.
State Bar No. 06672400
messmyer@essmyerdaniel.com
Essmyer & Daniel. P.C.
5111 Center Street
Houston, Texas 77007
 (713)869-1155 Telephone
 (713)869-8659 Facsimile
**Attorney for Appellant**
**CHRIS WILMOT**

# TABLE OF CONTENTS

**Contents**

TABLE OF CONTENTS ..................................................................................................ii

INDEX OF AUTHORITIES .........................................................................................iii

APPELLANT'S MOTION FOR *EN BANC* REHEARING ............................................. 1

A.     Background ........................................................................................................ 1

B.     Introduction ...................................................................................................... 2

C.     Reason to Grant Reahearing *En Banc* ........................................................... 4

D.     ARGUMENT ..................................................................................................... 4

    a.  The law precludes recovery of benefit of the bargain damages for a fraudulent inducement claim against a third party to the allegedly induced contract, contrary to the Panel Opinion. .............................................................................................. 6

    b.  The undisputed evidence showed Bouknight mitigated his damages by working elsewhere and being paid nearly the same amount contemplated by the employment contract with CIPR, and yet the District Court and the Panel erroneously disregarded that evidence and allowed Bouknight to also obtain lost wages under the employment contract with CIPR instead of mitigating the loss against a third party and failed to follow the law of Mitigation, in contradiction to Finding 5 and Conclusion 7. .............................................................................................. 10

    c.  Bouknight's fraudulent inducement claim fails, as a matter of law, based on the District Court's own Findings of Fact numbers 1-4 and Conclusion of Law number 1 and as found by the Panel. ........................................................................................ 15

E.     CONCLUSION ............................................................................................... 18

F.     PRAYER ......................................................................................................... 18

CERTIFICATE OF SERVICE ....................................................................................20

CERTIFICATE OF COMPLIANCE ...........................................................................21

# INDEX OF AUTHORITIES

**Cases**

Alexander and Alexander v. Bacchus Indus., 754 S.W.2d 252 (Tex.App.—El Paso 1988, writ denied)...................................................................................................14

*Auto Chem Laboratories, Inc. v. Turtle Wax, Inc.*, 2008 WL 4372697 at 16-18, 2010 U.S. Dist. LEXIS 100677 (S.D. Ohio Sept. 24, 2010) ...............................................8

*Crews v. Cortez*, 102 Tex. 111, 113 S.W. 523(1908) ......................................................14

*Dixie Glass v. Pollak*, 341 S.W.2d 530 (Tex.Civ.App.-Houston, writ ref'd n.r.e.per curiam, 162 Tex. 440, 347 S.W.2d 596 (1961) .............................................12

*Exxon Corp.v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 217(Tex. 2011) ......................15

*Formosa Plastics Corp.v. Presidio Eng'rs& Contractors, Inc.*, 960 S.W.2d 41(Tex. 1998) ...................................................................................................................16

*George v. Hesse*, 100 Tex. 44, 93 S.W. 107(1906)......................................................9, 10

*Gulf Consol Int'l Inc. v. Murphy*, 658 S.W.2d 565 (Tex. 1983)(per curiam) ...................12

*LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, LLC*, 659 F.3d 450(5th Cir. 2011) ................................................................................................6, 7, 8

*Professional Serv. Inc. v. Amaitis*, 592 S.W.2d 396 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.)...............................................................................................11, 13

*Rogers v. McGuffey*, 96 Tex. 565, 74 S.W. 753(1903) ...................................................14

*Smith v. Hamilton*, 237 S.W. 2d 774(Tex.Civ. App. –Austin 1951, no writ) .............12, 14

*Trenholm v. Ratcliff*, 646 S.W.2d 927, 930(Tex.1983) ....................................................16

*Warfa Leasing Corp. v. Prime Capital Corp.*, 339 F. Supp. 2d 1051(N.D. Ill. 2004)........8

**Other Authorities**

Restatement (Second) Of Torts § 549 ........................................................... 6, 7, 9

**Rules**

TEX. R. APP. P. 41.2 ...................................................................................... 2

TEX. R. APP. P. 9.4(i)(3)................................................................................ 21

**NO. 01-13-00738-CV**

_____

**IN THE FIRST COURT OF APPEALS**

_____


**CHRIS WILMOT,**
**Appellant**

**V.**

**HARRY A. BOUKNIGHT, JR.**
**Appellee**

FROM CAUSE NO.: 2010-00373;
*Harry A. Bouknight, Jr. v. WCW International, Inc. and Chris Wilmot*
IN THE 295TH JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

---

**APPELLANT'S MOTION FOR *EN BANC* REHEARING**

---

Appellant **CHRIS WILMOT**, ("WILMOT" herein), respectfully requests that

the full *en banc* Court reconsider the opinion of the Panel in this appeal[1] and that,

upon reconsideration, the *en banc* Court reverse the judgment below and either

render a take-nothing judgment in favor of WILMOT, or order a remittitur or a

remand for a reduction in damages, as set forth below.

### A. Background

1. Appellant is **CHRIS WILMOT**. ("**WILMOT**" herein).

2. Appellee is **HARRY A. BOUKNIGHT, JR.**, ("**BOUKNIGHT**" herein).

---

[1] **Exhibit 1** hereto.

1

3. A Panel of this Court issued the original judgment and memorandum opinion in this case on March 3, 2015. A copy of that memorandum opinion is attached as **Exhibit A.**

4. The Panel that rendered the judgment in this case consisted of Chief Justice Sherry Radack, and Justices Terry Jennings and Evelyn Keys.

5. WILMOT files this Motion for *En Banc* Rehearing in response to the March 3, 2015 opinion and judgment. At the same time, WILMOT has filed a motion for Panel rehearing.

6. The Court has the authority to grant this motion and conduct *en banc* reconsideration. TEX. R. APP. P. 41.2.

## B. Introduction

7. An *en banc* hearing should be held because it is patently unreasonable, and contrary to settled Texas law, for a contracting party like Bouknight to be able to sue a third party, non-signatory to a contract (WILMOT) for fraudulent inducement into the contract—rather than the counter-party (CIPR) to the contract for breach of contract—and then to be able to recover as damages *from that third party* the entire benefit of the bargain under the contract. It is even more perverse, and contrary to established Texas law, to allow Bouknight to recover the full amount owed under that employment contract notwithstanding that he undisputedly mitigated his losses by immediately finding employment elsewhere

2

and getting paid approximately $960,000 from the other employers during the same time period that he was to work for CIPR. Whether or not Bouknight had a duty to mitigate his damages, he did in fact mitigate them, and Texas law requires that his damages award be reduced by the amount of mitigation. By instead awarding the full amount allegedly owed under CIPR's employment agreement (against WILMOT, a third party to the contract) and ignoring the amount that Bouknight mitigated, the Trial Court gave Bouknight precisely the sort of double recovery that Texas law abhors, and the Panel erred in upholding it.

8. As set forth below, WILMOT is entitled as a matter of law to a holding that Texas law does not allow benefit of the bargain recovery from a third party in a fraudulent inducement case. WILMOT is further entitled to a remittitur of damages, or alternatively a remand, in order to properly apply the law of mitigation of damages. And finally, WILMOT urges that the fraudulent inducement claim fails based on the Trial Court's own finding that WILMOT lacked authority to bind CIPR to the employment contract. The Trial Court's finding means there was no valid contract between CIPR and Bouknight, but that defeats the fraudulent inducement claim as a matter of Texas law because such a claim requires that there have been inducement into a *valid* contract. Conversely, if, as the Trial Court and the Panel found, the CIPR contract is valid, then WILMOT did not commit a

3

material misrepresentation as he actually bound CIPR to the contract. The Court *En Banc* should reconsider these issues that are important to the state of Texas law.

## C. Reason to Grant Reahearing *En Banc*

9. WILMOT raised a number of issues in the appeal, which the Panel resolved in its opinion and judgment by affirming the Trial Court. WILMOT does not waive those issues.

10. This Motion for Rehearing *En Banc* also particularly addresses, without waiver of the other issues for a Petition for Review, the Panel 's resolution of three issues: (1) whether Texas law precludes recovery of benefit of the bargain damages for a fraudulent inducement claim against a third party; (2) whether the Trial Court and Panel erred by disregarding the undisputed evidence showing Bouknight mitigated his damages by working elsewhere and being paid nearly the same amount contemplated by the employment contract with CIPR; and (3) whether the fraudulent inducement claim fails, as a matter of Texas law, based on the Trial Court's own finding that WILMOT had no authority to bind CIPR into the employment contract with Bouknight, such that there was no valid contract; and then finding that there was a valid contract.

## D. ARGUMENT

11. This is an employment case. APX7; CR12-24; 5RR PEx.1. It involves an employment contract ("the CIPR Executive Engagement Agreement"), "EEA"

4

herein, allegedly between Bouknight and Cote d'Ivoire Peace Refinery, Ltd., "CIPR" herein, a non-party to this suit. APX6; 5RR PEx.1. The Trial Court and Panel allowed full benefit of the bargain damages against a third, non-contracting party, based on a fraudulent inducement claim, even though Bouknight went out and was employed elsewhere during nearly the entire period of time. This result was allowed by the Trial Court and the Panel based upon a contract to which the third party, Wilmot, was not a party, did not guarantee, and did not breach.

12. In the District Court, the only measure of damages ever pled by Bouknight was for contractual benefit of the bargain recovery under the CIPR Contract. CR12-24. Bouknight did not plead or place into evidence either reliance damages or cost of profit damages. APX7; CR12-24; 2RR19-22; 4RR113 and 119.

13. The only ground of recovery allowed in the Amended Judgment or by the Panel is fraud in the inducement, and solely as to Wilmot, individually. APX3 and CR1274. Further, the sole alleged misrepresentation found by the District Court is that Wilmot allegedly materially represented to Bouknight that Wilmot, as Chairman of the Board of CIPR, could bind CIPR; that such material representation was untrue; that Bouknight relied upon such representation; and that this representation caused benefit of the bargain damages to Bouknight. APX2 and CR1274-76. All other causes of action or fraud allegations pleaded by Bouknight are gone.

5

**a.** **The law precludes recovery of benefit of the bargain damages for a fraudulent inducement claim against a third party to the allegedly induced contract, contrary to the Panel Opinion.**

14. Bouknight is attempting to recover benefit of the bargain damages from a third party, Wilmot, not the party with which Bouknight contracted, CIPR, and is attempting to do it under the guise of fraudulent inducement law. Bouknight as a matter of law in a fraudulent misrepresentation case cannot recover benefit of the bargain damages related to a third party to a contract.

15. There are two measures of damages in fraudulent misrepresentation cases: (1) "out of pocket" damages or reliance damages, that restore the plaintiff to his position before the fraud; and (2) "benefit of the bargain" damages sufficient to give the plaintiff the benefit of his bargain with the defendant. *See,* Restatement (Second) Of Torts §549 at comment g, APX8; *see also LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, LLC*, 659 F.3d 450, 460 (5th Cir. 2011).

16. As to benefit of the bargain damages, the Restatement explains that when the plaintiff has made a bargain *with the defendant*, the plaintiff is entitled to the benefit of that bargain, including lost profits. *LHC* at 460. Where, however, the plaintiff has not entered into any transaction with the defendant, the plaintiff can recover only "out of pocket" costs. Bouknight did not contract with Wilmot individually and therefore, under the Restatement, Bouknight cannot recover benefit of bargain losses from Wilmot as Bouknight is then dealing with a third

6

party. The District Court and the Panel in the present case thus erroneously allowed Bouknight his benefit of the CIPR bargain by the District Court's Finding 5 and Conclusion 7. *Id.*

17. The Fifth Circuit recently addressed this type of scenario, where the alleged deceit did not allegedly come from the "maker" of the contract but instead a third party, in *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.* The plaintiff, a potential buyer of an option to purchase a shopping mall property, sued the seller for breach of contract, promissory estoppel, and fraudulent misrepresentation after the transaction failed to close. *Id.* at 453. The District Court granted a directed verdict against plaintiff on its contract claim because no contract was found to exist between the parties, but the fraud claim went to the jury. *Id.* The jury found for plaintiff on its fraud claim and awarded damages of $534,380.00 for "out of pocket" losses and $25,500,000.00 in lost profits. *See id.* The lost profits related to money the plaintiff expected to make from a lease with a third party after plaintiff acquired the shopping center from the defendant. *Id.* at 454. The Fifth Circuit, relying on the Restatement, APX8, held that because the plaintiff and defendant never had a contract, the plaintiff could not recover lost profits related to a third-party lease. *Id.* at 464 ("[w]hen the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance

7

upon the misrepresentation in dealing with a third person, these are the rules [out of pocket measure of damages] that must of necessity be applied.").

18.Other courts have also held that where the plaintiff and defendant had no contractual relationship, benefit of the bargain or lost profits related to a third-party deal are not available to the plaintiff as damages for fraud. *See Auto Chem Laboratories, Inc. v. Turtle Wax, Inc.*, 2008 WL 4372697 at 16-18, 2010 U.S. Dist. LEXIS 100677 at 26 (S.D. Ohio Sept. 24, 2010), APX9; *Warfa Leasing Corp. v. Prime Capital Corp.*, 339 F. Supp. 2d 1051, 1056 (N.D. Ill. 2004) ("Because of this basis of 'benefit of the bargain' damages in contract theory, it would be unfair for a plaintiff to collect 'benefit of the bargain' damages from a defendant that was not a party to the bargain…Therefore, to the extent a Moving Defendant was not a party to the bargain with Warfa, 'benefit of the bargain' damages are not available with respect to that defendant.").

19.The situation here is almost identical to the *Nashua* case. Bouknight claims that Wilmot fraudulently induced Bouknight into securing an agreement with a third party, CIPR. APX7. Bouknight had no contract with Wilmot (nor was one ever contemplated), but nevertheless Bouknight claims Wilmot is responsible for Bouknight's benefit of the bargain with CIPR. Just as the *Nashua* plaintiff never executed a contract with the defendant for the real estate transaction, Bouknight never had a contract with Wilmot. Just as the plaintiff in *Nashua* was denied

benefits of the bargain damage from its lease with a third party that failed to materialize due to the alleged fraud, Bouknight should be denied benefit of the bargain damages on a contract with third-party CIPR if it never materialized due to the alleged fraud.[2]

20. This result, which is mandated by the Restatement and case law, is also the logical result. Had the alleged fraudulent act, Wilmot representing that he could bind CIPR by his signature as Chairman of the Board of CIPR[3], not occurred, Bouknight presumably would not have pursued a contract with CIPR and would not have made any salary, as he had no job at the time.

21. In addition, Texas has in the past limited liability in deceit cases to the out-of-pocket measure of damages stated in Subsection (1) of the Restatement, and allowed no benefit of the bargain in such an action of deceit. *George v. Hesse*, 100 Tex. 44, 93 S.W. 107(1906); RESTATEMENT (SECOND) OF TORTS §549 at comment Reporter's Note 2, APX8.

22. In *George* the Texas Supreme Court held that in an action by a vendee against the vendor for damages for false representations to the effect that there was a well on the land, when there was not, the measure of damages was not the difference in value between the value of the land with a well and without it, but the

---

[2] Conversely, if the contract is valid, there is no fraud in this case.
[3] But since the Trial Court and Panel found that Wilmot did bind CIPR, and Wilmot testified at any rate that such was his intent, there was no fraud in the inducement.

difference between the value of the consideration given for the conveyance and the value of the land. The *George* Court went on to say that *George* is a case in which the plaintiff sues to recover damages, from the maker, for a fraudulent representation by which he has been induced to enter into a contract to his loss.

23. Clearly, the *George* Court held, the extent of plaintiff's loss is the difference between the value of that which he has parted with, and the value of that which he has received under the agreement. The contract in this case was not to convey a tract of land with a 'gusher' on it; but was to convey a certain tract of land, which was falsely represented to have a 'gusher' on it, which false representation was an inducement which led to the contract. Logically, therefore, what *George* has lost by the transaction is the measure of his reliance damage. Bouknight has no reliance damages, and he pled for none. This case needs to be reversed and rendered because, as a matter of Texas law, Bouknight is not permitted to recover the only type of damages that he pled and offered evidence on.

b. **The undisputed evidence showed Bouknight mitigated his damages by working elsewhere and being paid nearly the same amount contemplated by the employment contract with CIPR, and yet the District Court and the Panel erroneously disregarded that evidence and allowed Bouknight to also obtain lost wages under the employment contract with CIPR instead of mitigating the loss against a third party and failed to follow the law of Mitigation, in contradiction to Finding 5 and Conclusion 7.**

24. At a minimum, if Bouknight somehow can recover benefit of the bargain damages, the amount of damages as found by the District Court and the Panel

10

cannot stand, and to do so is to allow Bouknight a double recovery because it fails to account for the undisputed evidence of mitigation. The District Court's damage award, Finding 5 and Conclusion 7, is in error, or, alternatively, excessive, gives Bouknight a double recovery, is supported by no legally or factually sufficient evidence, and is contrary to the conclusive evidence of mitigation.

25. If the employment contract with CIPR had been performed as written, then Bouknight would not have been able to work for another company because the CIPR contract required 100% of Bouknight's time and effort. As such, the salary Bouknight gained from the other companies that Bouknight was able to work at, solely because he was no longer employed by CIPR, should be deducted from Bouknight's damages award.

26. As explained above, Bouknight sought benefit of the bargain damages, measured by the amount he claims was owed under the CIPR contract. Under settled Texas law, however, breach of contract damages must be reduced by the amount that a party mitigates after the breach.[4] That is the same outcome as in

---

[4] The inability of Bouknight to obtain benefit of the bargain damages against WILMOT was explicitly argued to the Trial Court at CR1194-95; 1340. At CR1225, paragraph 18, WILMOT urged to the Trial Court the damages issue of the employment agreement in *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 580-81 (Tex. App.-Houston [1st Dist.] 1992, no writ)., That case states that the general rule concerning mitigation of damages is applied in employment contracts by requiring a discharged employee to use reasonable diligence to seek other employment. *Gulf Consolidated Int'l, Inc. v. Murphy,* 658 S.W.2d 565, 566 (Tex.1983); *Professional Serv. Inc. v. Amaitis,* 592 S.W.2d 396, 397 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.). WILMOT has consistently made his mitigation argument.

11

employment cases for an aggrieved employee: correct damages measure is the present cash value of the employment contract, less any amounts the employee should, in the exercise of reasonable diligence, be able to earn through other employment. *See Gulf Consol Int'l Inc. v. Murphy*, 658 S.W.2d 565, 566(Tex. 1983)(per curiam). [5] When the employee proves that he actually obtained other employment, he must show the amount actually earned to prove his damages. *See Smith v. Hamilton*, 237 S.W. 2d 774, 777(Tex.Civ. App. –Austin 1951, no writ).

27.Likewise, the general rule as to the correct measure of damages for the wrongful discharge of an employee is the present cash value of the contract to the employee "... if it had not been breached, less any amounts that he should in the exercise of reasonable diligence be able to earn through other employment." *Dixie Glass v. Pollak*, 341 S.W.2d 530, 538 (Tex.Civ.App.-Houston, writ ref'd n.r.e.per curiam, 162 Tex. 440, 347 S.W.2d 596 (1961). That rule should apply in the present case.

28.It is the burden of one seeking damages, here Bouknight, to prove them.[6] Bouknight was required to prove his actual damages and any income actually earned during the period in question was properly admissible as rebuttal evidence. Since this was evidence in the nature of rebuttal, no pleadings were even necessary

---

[5] Bouknight in his brief did not contest the fact that this is an employment case arising under Texas law generally as to employment.

[6] Bouknight denied knowing his gross or taxable income for the relevant years. 2R.R.261-62

to support it. *Professional Services, Inc. v. Amaitis*, 592 S.W.2d 396 (Tex.Civ.App.-Dallas 1979, writ ref'd n.r.e.).

29. Applying these legal principles here, the judgment against Wilmot should be reversed and rendered, or a remittitur or a new trial should be granted, because the undisputed evidence—including Bouknight's admissions at trial—conclusively showed that Bouknight made as much or nearly as much money at his new employer (Willbros Group or the Japanese company he worked for at time of trial), starting almost immediately after Bouknight claims he left CIPR. In particular, Bouknight admitted that he received a $220,000 base salary, plus a $25,000 bonus (paid in 2010) and full benefits, from Willbros after allegedly leaving CIPR in September 2009, and that he missed at most 1 or 2 paychecks during a one-month period. He further admitted that as of May 2011 his salary rose to $280,000, plus full benefits and bonus opportunities (the bonus date with the current employer was to mature shortly after trial, and that dollar amount was not in evidence). Bouknight also received $80,000.00 from Spectrum. This totals $920,000.00.

30. The CIPR contract required 100% of Bouknight's time. Bouknight could not be at two jobs at once. As a matter of law, Bouknight cannot recover from Wilmot the amount of his employment agreement with CIPR for time periods during which Bouknight had other, paid employment.

31. In any event, if any recovery is allowed, the best rule, even in a fraud in the

13

inducement case, is that stated years ago in *Smith v. Hamilton,* 237 S.W.2d 774, 777(Tex.Civ.App.-Austin 1951, no writ), that by the weight of Texas authority, the rule of minimizing the damages is made applicable to cases such as this, and the measure of recovery is the sum that would have been earned under the contract, less what the employee earned in other employment, or by the exercise of reasonable diligence could have earned during the unexpired portion thereof. *Rogers v. McGuffey*, 96 Tex. 565, 74 S.W. 753 (1903); *Crews v. Cortez*, 102 Tex. 111, 113 S.W. 523(1908).

32. The law prohibits an injured party from recovering damages that could have been avoided or were incurred as a result of the failure to mitigate. *Alexander and Alexander v. Bacchus Indus.,* 754 S.W.2d 252, 253 (Tex.App.—El Paso 1988, writ denied). Thus, even if Bouknight were correct in all other respects, no award of damages against a third party can include the amounts Bouknight was paid by his new employment, which, as described above, totals at least $840,000 in salary and bonuses alone, plus another $80,000 paid to Bouknight by Spectrum. That means Bouknight's recovery of $1,337,500.00 in the Amended Judgment, which represented the $25,000.00 alleged base salary for the remainder of the CIPR contract without any reduction for these mitigation amounts, must be reduced by at least $920,000, to an alternative recovery amount of $417,500.00, and that is before one considers, as discussed in Wilmot's earlier briefs, if $25,000 per month

14

is the appropriate monthly amount to apply and what is the appropriate period of time for the application of that monthly amount, if any.

33. In sum, the evidence conclusively establishes these mitigation damages, and as a matter of law, Bouknight cannot recover these amounts. Because the District Court's and the Panel 's damages award includes these amounts, it is an excessive award, it is supported by no legally or factually sufficient evidence, it is contrary to the conclusive evidence, and either a rendition or a remittitur or a new trial should be granted. Allowing Bouknight to recover these amounts from Wilmot, while Bouknight successfully mitigated his alleged damages, would lead to an impermissible double recovery and such fails to follow the established law of mitigation

**c.** **Bouknight's fraudulent inducement claim fails, as a matter of law, based on the District Court's own Findings of Fact numbers 1-4 and Conclusion of Law number 1 and as found by the Panel.**

34. To prevail on a fraud claim, Bouknight must prove that: (1) Wilmot made a material representation that was false; (2) Wilmot knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Wilmot intended to induce Bouknight to act upon the representation; (4) Bouknight actually and justifiably relied upon the representation, and (5) Bouknight had actual injury caused by the Wilmot representation. *See Exxon Corp.v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217(Tex. 2011)*, Trenholm v.*

*Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). Further, in a fraudulent *inducement* case such as Bouknight's, there are the additional requirements that the tortfeasor must have reason to expect that the plaintiff will enter into a binding agreement based on the false representation, and that the plaintiff actually entered into a binding agreement based on the alleged representation. *See Formosa Plastics Corp.v. Presidio Eng'rs& Contractors, Inc.*, 960 S.W.2d 41, 48(Tex. 1998); *Haase v. Glazner*, 62 S.W.3rd 795, 797-98(Tex. 2001).

35.Critically, Bouknight does not deny that a fraudulent inducement case requires as one of its elements a valid binding contract.[7] *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 962 S.W.2d 41, 48(Tex. 1998), and *Haase v. Glazner*, 62 S.W. 3rd 795, 797-98(Tex. 2001). Nor could he.

36.Here, however, the Trial Court's only finding of misrepresentation by Wilmot was that he represented to Bouknight that Wilmot had authority to bind CIPR to the terms of the CIPR contract, when did not. APX2; Findings 1 and 2. The Court found that this representation was false, that Wilmot did not have authority to bind CIPR, and that Wilmot was aware that he did not have such authority. APX2; Findings 1-4. Yet, these findings, if true – and they are not true, as they are unsupported by legally or factually sufficient evidence - would defeat any claim of fraudulent inducement *as a matter of law*. If Wilmot lacked the ability

---

[7] And if the CIPR contract was a binding, valid contract then there was no fraud as Wilmot bound CIPR by his signature. Thus, Bouknight's entire case falls.

to bind CIPR to an employment contract, then there was no valid and binding contract and, therefore, a fraudulent inducement claim would fail under Texas law. *See Haase*. This fact alone requires reversal and rendition in Wilmot's favor.

37. Of course, if – as Wilmot urges in his briefs - there is no legally or factually sufficient evidence that Wilmot's alleged material representation was false or knowingly false, then that means Wilmot did have the ability to bind CIPR to the employment contract, thereby satisfying the requirement of the existence of a valid contract element for fraudulent inducement. In that case, however, then there is no fraudulent inducement because there is no evidence on those required elements of the fraud claim; there is no material misrepresentation at all. One way or the other, the fraudulent inducement judgment cannot stand.

38. In sum, as a matter of law, for there to be any finding of fraud in the inducement, the CIPR contract must have been a valid, binding contract. If the CIPR contract is not valid and binding because (as the District Court found in Findings 1 and 2 and the Panel affirmed) Wilmot lacked the authority to bind CIPR to it, then there cannot be fraud in the inducement because there is no binding contract. *Haase v. Glazner*, 62 S.W.3d 795, 797-98(Tex. 2001). Yet, if the contract is valid and binding because Wilmot *did* have authority to bind CIPR, then there was no misrepresentation and therefore no fraud in the inducement. Either way, the case must be reversed and rendered.

17

## E. <u>CONCLUSION</u>

39. As it stands, the Panel rather than applying the correct law as to damages and fraud in the inducement enforced the terms of a contract on a non-party to the contract even without a showing by the contracting party that such contract was valid or invalid, and with a showing of a lack of harm to the contracting party. The entire Court sitting *En Banc* should review these issues on appeal and render a cohesive opinion so as to give guidance not only to the litigants in this case but to others who will read this opinion looking for the correct interpretation particularly of these particular laws on the allowance of benefit of the bargain damages to a third party in a fraudulent inducement case.

## F. <u>PRAYER</u>

40. For these reasons, WILMOT respectfully asks the Court to grant this Motion to Rehear the case *En Banc*, to hear the issues *En Banc,* and to reverse and render the case, or alternatively order a remittitur or a remand, and for such other relief as this Court deems just.


SIGNED:      April 17, 2015

Respectfully submitted,

*/s/ Michael M. Essmyer, Sr.*
MICHAEL M. ESSMYER. SR.
State Bar No. 06672400
Michael M. Essmyer, Jr.

18

Texas Bar No.24076372
Essmyer & Daniel. P.C.
5111 Center Street
Houston, Texas 77007
(713)869-1155 Telephone
(713)869-8659 Facsimile
messmyer@essmyerdaniel.com

**Attorneys for Appellant**
**Chris Wilmot**

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2014, Appellant CHRIS WILMOT'S

Motion for *En Banc* Rehearing was served on the following via by EFile:

Brian Charles Poldrack     *Via EFile*
Anne Marie Finch
ZIMMERMAN AXELRAD MEYER STERN & WISE PC
3040 Post Oak Boulevard, Suite 1300
Houston, Texas 77056

*Attorneys for Appellee*
*Harry A. Bouknight, Jr.*

/s/ *Michael M. Essmyer, Sr.*
Michael M. Essmyer, Sr.

## CERTIFICATE OF COMPLIANCE

As required by TEX. R. APP. P. 9.4(i)(3), I certify that this document was generated by a computer using Microsoft Word, which indicated the word count of this document is 4,364 words.

*/s/ Michael M. Essmyer, Sr.*



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-13-00738-CV**

———————————

**CHRIS WILMOT, Appellant**

**V.**

**HARRY A. BOUKNIGHT, JR., Appellee**

———

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-00373**

———

**O P I N I O N**

Appellee, Harry A. Bouknight, Jr., sued appellant, Chris Wilmot, for fraudulent inducement relating to an employment contract and, following a bench trial, the trial court rendered judgment in Bouknight's favor. In five issues on

Exhibit 1

appeal, Wilmot challenges the trial court's judgment, arguing that (1) Bouknight's fraudulent inducement claim fails as a matter of law; (2) the evidence supporting the trial court's finding of fraudulent inducement was legally and factually insufficient; (3) the evidence supporting the trial court's award of damages was legally and factually insufficient; (4) various legal doctrines, such as the economic loss rule, prohibit Wilmot's liability as a matter of law, and (5) the Texas Supreme Court's opinion in *Sawyer v. E.I. DuPont De Nemours & Co.* precludes Bouknight's recovery.

We affirm.

## Background

Petroci, the national oil company of Côte d'Ivoire in West Africa, wanted to build a refinery, also known as the Côte d'Ivoire Peace Refinery. Through its managing director, Kassoum Fadika, it contracted with WCW International, Inc. ("WCW") to manage the project, which included everything from obtaining a feasibility study through final development of the Peace Refinery. Wilmot is the sole owner of WCW and a majority owner of its holding company, WCW International Holding Company, Ltd. ("WCW Holding"). In 2007, Wilmot hired a company called Energy Allied International ("Energy Allied") to prepare a feasibility study for building the Peace Refinery. Bouknight, an engineer specializing in the energy industry, worked for Energy Allied at the time Wilmot

2

hired it. Bouknight was involved in completing and presenting a feasibility study on the Peace Refinery Project to government officials in Côte d'Ivoire. The Côte d'Ivoire government and Petroci approved the Peace Refinery Project and a site was dedicated in Abidjan, Côte d'Ivoire.

In November 2007, because of Bouknight's role in the feasibility study and his experience in the field, Wilmot sought Bouknight's participation in the Peace Refinery Project by asking him to serve as chief operating officer ("COO").

In December 2007, planning for the Peace Refinery Project began in earnest. Energy Allied withdrew from the project because it could not obtain the necessary funding. Bouknight decided to leave Energy Allied and work for Wilmot at WCW. Project development activities began in early 2008, and Bouknight signed an executive employment agreement ("EEA") with Côte d'Ivoire Peace Refinery Ltd. ("CIPR"), a corporation formed by Petroci and WCW Holding.

The EEA provided that it was made effective as of January 5, 2008. It stated that it was entered into between Bouknight and the "Cote d'Ivoire Peace Refinery Ltd, a corporation incorporated under the law of the British Virgin Islands, with its principal place of business at 1001 McKinney, Suite 1660, Houston (hereinafter referred to as the "Company")." The EEA stated that the "Company hereby agrees to engage [Bouknight] as its Chief Operating Officer ("Executive") and Executive hereby accepts such employment in accordance with the terms of this Agreement."

3

It set out Bouknight's responsibilities as COO, including "solicit[ing], identify[ing] and secur[ing] new business opportunities for Company" and "manag[ing] and supervis[ing] the construction of the refinery and related facilities."

Regarding compensation, the EEA provided that Bouknight was entitled to a $100,000 signing bonus, $300,000 in annual salary for the first year, $400,000 in the following years, and various stock options and other benefits. The majority of the compensation provisions were contingent upon CIPR's obtaining initial funding for its activities: "Executive acknowledges that Company is in the process of obtaining initial funding for the activities of the Company and execution of the Project and consequently Company would not be able to commence payment of the entire base salary until such initial funding is in place." However, the EEA provided, "In the interim and until the initial funding is acquired, Company agrees to pay Executive a monthly allowance of $25,000."

The EEA was to remain in effect for a term of five years and was subject to renewal under certain circumstances. The EEA also provided that it "may be terminated at Company's discretion, provided that Company shall pay to Executive an amount equal to payment at Executive's base salary rate for the remaining period of the Agreement."

Following execution of the EEA, Bouknight worked to obtain funding for the Peace Refinery Project. Petroci wired $2.5 million to WCW that Bouknight

4

contended was for the Peace Refinery Project, and Bouknight eventually arranged a financing deal with a Chinese bank. In the meanwhile, Bouknight was not being paid regularly under the terms of the EEA. He informed Wilmot that he was not being paid, and Wilmot told him that he would be paid and that things were just slow. CIPR paid Bouknight a total of $152,500.

In April 2009, Bouknight and Wilmot traveled to China to complete the financing deal. In September 2009, Wilmot sent Bouknight an email terminating his employment and representing that CIPR would not honor the EEA.

The Peace Refinery Project subsequently collapsed. According to Wilmot, this was due in part to the financial collapse that began in 2008 and in part to a war and regime change in Côte d'Ivoire.

Bouknight sued Wilmot and WCW for tortious interference with the EEA, for conspiracy, and for fraudulent inducement, and he also argued that he was entitled to recover under a quantum meruit theory. Wilmot designated CIPR as a responsible third party and asserted cross-claims against Bouknight.

Bouknight testified at trial that Wilmot recruited him to be COO of CIPR, telling him that he was needed for his technical experience and his previous work on the project while he was employed by Energy Allied. Bouknight stated that, based on a verbal agreement between Wilmot and himself, he began working out of an office at WCW. As far as he was aware, there was never a separate office for

CIPR in Houston. Bouknight testified that in January 2008, when he signed the EEA, Wilmot told him that the agreement had to be between Bouknight and CIPR, rather than Wilmot individually or WCW, because CIPR was the entity that was going to lead the development of the Peace Refinery and ultimately operate it.

At the time he left his employment with Energy Allied and signed the EEA, Bouknight did not have first-hand knowledge of the financial situation or corporate structure of CIPR, and he relied upon what Wilmot told him. He testified that Wilmot negotiated the terms of the EEA with him, acted as his supervisor and assigned him work on behalf of CIPR, and provided him with his paychecks. Bouknight became aware that CIPR had a bank account that Wilmot controlled. He stated that whenever he would complain to Wilmot that he had not been paid in accordance with the terms of the EEA, Wilmot would assure him that he was arranging for payment and that Bouknight would be paid soon. Bouknight further testified that Wilmot was very complimentary of his work on behalf of CIPR.

However, in September 2009, Bouknight received an email from Wilmot terminating his employment. The September 2009 email stated that his employment on the project had actually been terminated in April 2009, before Bouknight's trip to China to obtain funding from a Chinese bank. Shortly after receiving this email, Bouknight obtained other employment.

Wilmot testified at trial that Bouknight was recruited by other people involved in the Peace Refinery Project and that he paid Bouknight as a consultant. He further stated that Bouknight was "kicked out by Energy Allied" and that he allowed Bouknight to office out of WCW as a favor. Regarding the EEA, Wilmot testified that he intended to bind CIPR to the EEA. However, he also testified that he knew he did not have authority to bind CIPR to the EEA at the time he and Bouknight executed it because his authority was subject to board approval. Wilmot, who was the chairman of CIPR's board, stated that the board never met or considered the EEA. He testified that he never called a board meeting because the formulation of the board changed and CIPR changed its organizational structure.

Wilmot testified that in March 2008, approximately two months after he and Bouknight signed the EEA, he traveled to Côte d'Ivoire and met with the Chief Executive, Kassoum Fadika, who told him that CIPR could not sign the document. Wilmot testified that the laws of Côte d'Ivoire precluded Bouknight from being an employee of CIPR and that Bouknight could only function as a consultant. Wilmot also testified that the only reason the EEA was ever effective was because he was trying to do a personal favor for Bouknight after Bouknight lost his job at Energy Allied. He further testified that he called Bouknight to his office, first in April 2008 and then again in April 2009, and told him that CIPR was terminating the EEA. After originally indicating that CIPR never approved the EEA and that it

7

was terminated in March 2008, Wilmot subsequently testified that CIPR terminated the EEA in April 2009.

Wilmot testified that the EEA was a contingent contract because it was not enforceable unless initial funding occurred. He argued that initial funding was $40 million, and CIPR never obtained this amount. Wilmot further testified that he and Bouknight discussed and understood that Bouknight was working as a contractor and that they did not have a written consultation agreement because he believed a handshake was sufficient to establish the agreement. Wilmot also argued at trial that Bouknight never complained of any violations of the EEA in writing.

Wilmot challenged Bouknight's ability to pursue liability solely against Wilmot personally. He testified that he was an agent of CIPR at all relevant times. As such, he argued, he could not be personally liable to Bouknight under the EEA. Wilmot also testified that Bouknight knew and worked with Kassoum Fadika, another principal of CIPR, and that Bouknight was aware that CIPR was a start-up company with uncertain funding and that the business and political climate in Côte d'Ivoire was unstable. Thus, he argued, Bouknight was a knowing and willing participant in the enterprise, and he could not have relied upon any representations made by Wilmot.

The trial court found in Bouknight's favor on his fraudulent inducement claim against Wilmot individually and awarded Bouknight $1,337,500 in damages

8

on that claim. The trial court determined that Wilmot and WCW did not commit tortious interference with a contract or conspiracy and that Bouknight was not entitled to relief for quantum meruit. The trial court likewise found that Wilmot and WCW failed to establish their counter-claims against Bouknight.

In its findings of fact and conclusions of law, the trial court found that Wilmot represented to Bouknight that Wilmot had the authority to bind CIPR to the terms of the EEA and that "[t]his was an intentional material misrepresentation." The trial court further found that Wilmot did not have the authority to bind CIPR to the EEA, that Wilmot knew he did not have the authority to bind CIPR to the EEA, and that Bouknight "reasonably relied on [Wilmot's] misrepresentations when entering into the [EEA]." The trial court determined that Bouknight suffered economic damages as a result of Wilmot's fraud in the inducement because he was "owed $25,000 a month for five years . . . decreased by the amount of $152,500.00 which he [had] previously received for his services." Accordingly, the trial court concluded that Wilmot "committed fraudulent inducement against" Bouknight and that Bouknight was entitled to $1,337,500 in economic damages.

**Fraudulent Inducement**

In his first issue, Wilmot argues that Bouknight's fraudulent inducement claim fails as a matter of law based on the trial court's findings that Wilmot did not

have authority to bind CIPR to the EEA. He argues that if he did not have authority to bind CIPR to the EEA, then there was no valid and binding contract and, therefore, Bouknight's fraudulent inducement claim fails under Texas law. In his second issue, Wilmot argues that the evidence is legally and factually insufficient to support the trial court's findings on each element of fraudulent inducement. In his fourth issue, Wilmot argues that "[t]here is no legally or factually sufficient evidence or the [judgment] otherwise cannot legally stand" because all of his acts were done as an agent of CIPR, the economic loss rule bars recovery, the EEA's merger clause prohibits a fraud in the inducement finding, and CIPR is a responsible third party. In his fifth issue, Wilmot argues that the Texas Supreme Court case *Sawyer v. E.I. DuPont De Nemours & Co.* prohibits recovery for fraudulent inducement in this case. We construe all of these arguments as attacking the legal and factual sufficiency of the evidence to support trial court's judgment in favor of Bouknight on his fraudulent inducement claim.

## A. Standard of Review

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal sufficiency of the evidence used to support them just as we would review a jury's findings. *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Catalina v. Blasdel*, 881 S.W.2d

10

295, 297 (Tex. 1994)). In conducting a legal-sufficiency review, we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.— Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We sustain a no-evidence contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

In reviewing a challenge to the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). The trial court acts as fact-finder in a bench trial and is the sole judge of the credibility of witnesses. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190

11

S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We review a trial court's conclusions of law de novo, and we will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *In re Moers*, 104 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

**B.    Law of Fraudulent Inducement**

The elements of fraud are: (1) that the speaker made a material misrepresentation (2) that he knew was false when he made it or that he made recklessly without any knowledge of its truth and as a positive assertion (3) with the intent that the other party act upon it and (4) that the other party acted in reliance on the misrepresentation and (5) suffered injury thereby. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question." *Id.* Fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001); *Clark v. Power Mktg. Direct, Inc.*, 192 S.W.3d 796, 799 (Tex. App.—Houston [1st Dist.] 2006, no pet.). That is, with a fraudulent inducement claim, the

12

elements of fraud must be established as they relate to an agreement between the parties. *Haase*, 62 S.W.3d at 798–99.

Fraud requires a showing of actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). In evaluating justification, the court considers whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* (quoting *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)).

## C.    Legal and Factual Sufficiency of the Evidence

The trial court found that Wilmot made a material misrepresentation to Bouknight when he represented that he had the authority to bind CIPR to the terms of the EEA. The trial court further found that Wilmot did not have the authority to bind CIPR to the EEA, that Wilmot knew he did not have the authority to bind CIPR to the EEA, and that Wilmot's misrepresentation was "intentional." The trial court also found that Bouknight "reasonably relied on [Wilmot's] misrepresentations when entering into the [EEA]."

The misrepresentation identified by the trial court was Wilmot's representation to Bouknight that Wilmot had the authority to bind CIPR to the EEA. This is the type of information that "a reasonable person would attach

13

importance to and would be induced to act on . . . in determining his choice of actions in the transaction in question." *See Italian Cowboy*, 341 S.W.3d at 337. Thus, it was a material misrepresentation.

Wilmot signed the EEA in his capacity as "Chairman" of CIPR. He acknowledged at trial that he did not have authority to bind CIPR to the EEA and that he knew he lacked such authority at the time he and Bouknight executed the EEA. He also knew he needed the approval of CIPR's board, but he, in his capacity as chairman of the board, never called a board meeting and never presented the EEA to the board for approval. He further testified that he knew in March 2008 that CIPR would not agree to the EEA, but he testified that he did not provide this information to Bouknight until April 2008 or April 2009. This is legally and factually sufficient evidence that Wilmot made a material misrepresentation that he knew was false when he made it. *See id.*; *see also City of Keller*, 168 S.W.3d at 810 (setting out standard for legally sufficiency review); *Arias*, 265 S.W.3d at 468 (setting out standard for factual sufficiency review).

Bouknight, on the other hand, testified that Wilmot recruited him to work as CIPR's COO and that he did extensive work for the Peace Refinery Project, including traveling to Africa and Asia and obtaining funding for the project, while under the impression that he was an executive of CIPR. He stated that every time he complained to Wilmot that he was not being paid under the terms of the EEA,

14

Wilmot assured him that the financial arrangements were being made and that he would receive his full compensation soon. Bouknight testified that Wilmot did not tell him that CIPR would not honor the EEA until September 2009. This is legally and factually sufficient evidence that Wilmot misrepresented his authority to enter into the EEA with the intent that Bouknight act upon it by agreeing to the EEA and providing services pursuant to its terms. *See Italian Cowboy*, 341 S.W.3d at 337; *City of Keller*, 168 S.W.3d at 810; *Arias*, 265 S.W.3d at 468.

Finally, Bouknight testified that, at the time he entered into the EEA and left his consulting job with Energy Allied, he relied on Wilmot's representations about CIPR's corporate structure and financing. He testified that he performed work for the Peace Refinery Project in what he believed was his capacity as COO, including overseeing development and obtaining funding. Specifically, Bouknight testified that he flew to China to finalize a funding deal with a Chinese bank in April 2009 and that Wilmot did not inform him that CIPR would not honor the EEA until September 2009, after Bouknight had once again asked about his compensation and status on the Peace Refinery Project. Wilmot testified that he told Bouknight that CIPR would not honor the EEA in April 2008 or 2009 and that Bouknight continued working only as a consultant, but Wilmot acknowledged that they had no written consulting agreement. Although the parties disagreed about whether initial funding was obtained that would trigger all of the EEA's compensation

15

provisions, it is undisputed that Bouknight was not paid the monthly allowance of $25,000 that was due him under the terms of the EEA "[i]n the interim and until the initial funding [was] acquired" for the Peace Refinery. Rather, Bouknight was paid $152,000 for his work between January 2008 and September 2009. Thus, there was sufficient evidence to support the trial court's finding that Bouknight acted in reliance on Wilmot's misrepresentation and that he suffered injury thereby. *See Italian Cowboy*, 341 S.W.3d at 337 (setting out elements of fraud); *City of Keller*, 168 S.W.3d at 810; *Arias*, 265 S.W.3d at 468.

Likewise, there is evidence that the fraud here arose in the context of a contract, namely the EEA. *See Haase*, 62 S.W.3d at 798. Wilmot argues that because the trial court found that he did not have the authority to bind CIPR to the EEA, it was not a valid contract and thus will not support a conclusion that he fraudulently induced Bouknight into the executing the EEA, and he relies on *Haase* to support his argument. However, *Haase* is distinguishable from the present case. In *Haase*, the supreme court held that Texas law imposes a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations, but "there can be no breach of that duty when one is not induced into a contract." *Id.* at 798. The *Haase* court stated, "[W]hen a party has not incurred a contractual obligation, it has not been induced to do anything." *Id.*

16

It concluded that because the parties in *Haase* "never reached a final agreement" the plaintiff could not maintain a fraudulent inducement claim. *Id.*

Here, by contrast, the trial court never found that the EEA was not a valid agreement. It merely found that Wilmot misrepresented his authority to enter into it on behalf of CIPR. The record demonstrates the existence of a valid contract, in that Wilmot offered Bouknight employment as the COO of the Peace Refinery Project, Bouknight accepted his offer, both of them agreed to the terms set forth in the EEA and executed the agreement, and Bouknight performed his obligations under the EEA. *See DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (setting out elements of valid contract as requiring "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) an execution and delivery of the contract with the intent that it be mutual and binding").

There is likewise evidence of Bouknight's detrimental reliance on Wilmot's misrepresentation: Bouknight left his consulting position with Energy Allied after being recruited by Wilmot, and he worked on the Peace Refinery Project while under the impression that he was an executive on the project and believed Wilmot's representations that the financing was being arranged and that he would soon get paid under the terms of the EEA. *See Haase*, 62 S.W.3d at 798 (discussing significance of detrimental reliance element of fraudulent inducement

17

claim). Texas courts have long held that when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud. *See, e.g.*, *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.*, 823 S.W.2d 591, 597 (Tex. 1992).

We conclude that the evidence was legally and factually sufficient to support the trial court's conclusion that Wilmot fraudulently induced Bouknight into executing the EEA.

Wilmot also argues that he cannot be held liable for fraudulent inducement in his individual capacity because he acted at all times as an agent of CIPR. However, as we discussed above, the evidence was sufficient to support the trial court's conclusion that Wilmot did not have the authority to bind CIPR to the EEA. Wilmot has pointed to no legal authority to support his contention that he should not be held liable for his own acts of fraud. *See, e.g.*, *Kingston v. Helm*, 82 S.W.3d 755, 758–59 (Tex. App.—Corpus Christi 2002, pet. denied) (holding that corporation's employee is personally liable for tortious acts that he directs or participates in during his employment and that "a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative of the corporation") (citing *Leyendecker & Assocs., Inc v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984), and

18

*Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex. App.—Corpus Christi 1989, writ denied)); *Maintenance, Inc. v. ITT Hartford Group, Inc.*, 895 S.W.2d 816, 819 (Tex. App.—Texarkana 1995, writ denied) ("An agent may be liable for its own acts of negligence or fraud committed in performing a contract for its principal if those negligent or fraudulent acts cause reasonably foreseeable harm to a third party.").

Wilmot argues that the merger clause in the EEA prevents a finding of fraudulent inducement. However, even a written contract containing a merger clause can be avoided for fraud in the inducement, and the parol evidence rule does not stand in the way of proof of such fraud. *Italian Cowboy*, 341 S.W.3d at 331; *see also Formosa Plastics*, 960 S.W.2d at 46 ("This Court has also repeatedly recognized that a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract."); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957) ("[T]he law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it.").

Wilmot further argues that the economic loss rule prohibits Bouknight from prevailing on his fraudulent inducement claim. This argument likewise fails because the Texas Supreme Court has held that "tort damages are not precluded

19

simply because a fraudulent representation causes only an economic loss." *Formosa Plastics*, 960 S.W.2d at 47.

Wilmot also contends that Bouknight's fraudulent inducement claim must fail as a matter of law because CIPR was a responsible third party. The trial court permitted Wilmot to name CIPR as a responsible third party. However, the trial court did not apportion any liability to CIPR in its findings of fact and conclusions of law or in its final judgment. Furthermore, Wilmot has not presented any evidence that CIPR was a participant in his fraud against Bouknight. Thus, this argument also fails.

Finally, Wilmot argues that the supreme court's opinion in *Sawyer v. E.I. DuPont De Nemours & Co.* prohibits Bouknight from establishing his fraudulent inducement claim. In *Sawyer*, former employees brought an action against their former employer, DuPont, alleging that they were fraudulently induced to terminate their employment with DuPont and accept employment with its wholly-owned subsidiary, DuPont Textiles and Interiors ("DTI"). 430 S.W.3d 396, 398 (Tex. 2014). The former employees alleged that DuPont assured them that it would not sell DTI and that they would continue to have the same pay and benefits they had had at DuPont. *Id.* However, after the employees moved to DTI, DuPont sold DTI to another company that reduced the former DuPont employees' pay and benefits. *Id.* The supreme court held that because the employees were at-will

employees, they could not bring an action for fraud that depended upon continued employment, citing the holding of various Texas courts that "a fraud claim cannot be based on illusory promises of continued at-will employment." *Id.* at 400.

*Sawyer* is factually distinguishable from the present case, which does not involve a promise of continued at-will employment. Bouknight was not an at-will employee of Wilmot's at the time that Wilmot made the fraudulent misrepresentation that induced Bouknight to leave his consulting job with Energy Allied and work for CIPR with Wilmot as his supervisor. In fact, Bouknight was hired for a term of years pursuant to the EEA, which obligated his new employer to provide him with at least his base pay for a period of five years unless he was terminated for cause. Thus, *Sawyer* does not apply here. Furthermore, as the *Saywer* court recognized, its holding in that case did not mean that even an at-will employee can never sue for fraud. *Id.* "Recovery of expenses incurred in reliance on a fraudulent promise of prospective employment has been allowed because neither the injury nor the recovery depends on continued employment." *Id.* Again, here, Wilmot fraudulently induced Bouknight to enter into the EEA by misrepresenting his authority to bind CIPR to the EEA. Bouknight performed the services and duties of the COO as set out in the EEA, but he was not paid according to its terms because of Wilmot's fraudulent misrepresentation.

We overrule Wilmot's first, second, fourth, and fifth issues.

## Damages

In his third issue, Wilmot argues that the evidence is legally and factually insufficient to support the trial court's award of damages. Alternatively, he argues that the amount of damages awarded was excessive.

### A.     Damages for Fraudulent Inducement

Damages for fraudulent inducement typically conform to one of two measures of damages: an "out-of-pocket" measure or a "benefit-of-the-bargain" measure. *See, e.g.*, *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009); *Formosa Plastics*, 960 S.W.2d at 49. "The out of pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." *Aquaplex, Inc.*, 297 S.W.3d at 775 (quoting *Formosa Plastics*, 960 S.W.2d at 49); *see also Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (per curiam) (observing that out-of-pocket damages "derive from a restitutionary theory," while benefit-of-the-bargain damages "derive from an expectancy theory"). "Under the benefit-of-the bargain measure, lost profits on the bargain may be recovered if such damages are proved with reasonable certainty." *Aquaplex, Inc.*, 297 S.W.3d at 776 (citing *Formosa Plastics*, 960 S.W.2d at 50).

22

**B.     Sufficiency of the Evidence of Damages**

Here, the trial court found that Bouknight "suffered economic injury as a result of [Wilmot's] fraud in the inducement" and that Bouknight "was owed $25,000 per month for five years." The trial court found that the amount that Bouknight was owed must be "decreased by the amount of $152,500 which he [had] previously received for his services." It awarded Bouknight damages of $1,337,500.

The trial court based its findings on the clause in the EEA that provided, "In the interim and until the initial funding is acquired, Company agrees to pay Executive a monthly allowance of $25,000." The EEA, by its own terms, was to be effective from when it was executed in January 2008 for a period of five years. Furthermore, the terms of the agreement required payment of "an amount equal to [Bouknight's] base salary rate for the remaining period of the Agreement" if the EEA was terminated at CIPR's discretion at any point. It is undisputed that Bouknight was paid $152,500 for his work. Thus, there was sufficient evidence to support the trial court's conclusion that $1,337,500 constituted the benefit of the bargain to Bouknight. Stated another way, that amount, as proved with reasonable certainty by Bouknight based on the terms of the EEA and the evidence presented at trial, reflected the difference between the value of the EEA as represented to

Bouknight and the value he actually received. *See Aquaplex, Inc.*, 297 S.W.3d at 775–76.

Wilmot argues that Bouknight could not obtain benefit-of-the-bargain damages in this case because Bouknight did not contract with Wilmot in his individual capacity. However, as we have already held, the record demonstrates the existence of a valid contract, in that Wilmot offered Bouknight employment as the COO of the Peace Refinery Project, Bouknight accepted his offer, both of them agreed to the terms set forth in the EEA and executed the agreement, and Bouknight performed his obligations under the EEA. *See DeClaire*, 260 S.W.3d at 44 (setting out elements for valid contract). Likewise, Wilmot has not presented any valid legal theory supporting his claim that he cannot be held individually liable for his own act of fraud. *See, e.g.*, *Kingston*, 82 S.W.3d at 758–59.

Wilmot also argues that Bouknight mitigated his damages by working elsewhere following his termination in 2009. However, the fact that Bouknight was subsequently employed by a different company is irrelevant in determining the benefit he anticipated from the performance of the EEA. The EEA entitled him to five years of his base salary if CIPR terminated his employment in its discretion before the EEA expired on its own terms. The EEA did not limit Bouknight's ability to find new employment upon termination or otherwise condition the payment of his base salary for the full term of the contract on his remaining

24

unemployed after being terminated by CIPR at its discretion. An injured party is required to exercise reasonable care to minimize his damages, if the damages can be avoided with only slight expense and reasonable effort. *Harris Cnty. v. Smoker*, 934 S.W.2d 714, 721 (Tex. App.—Houston [1st Dist.] 1996, writ denied). As the terms of the EEA demonstrate, no action on Bouknight's part could have minimized his employer's damages for the failure of the EEA. *See id.* Wilmot does not cite any authority indicating that Bouknight should not receive as damages the amount he would have received under the EEA had it been performed according to its terms. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 135 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) (holding that breaching party bears burden of proving that damages could have been mitigated and that injured party was not required to mitigate its damages by forgoing its rights and remedies under its agreement with breaching party).

Wilmot also argues that there was no evidence that his fraudulent inducement was the proximate cause of Bouknight's damages. He argues that factors such as the financial crash of 2008 and the civil war in Côte d'Ivoire were the causes of the failure of the Peace Refinery Project and CIPR. However, as discussed above, the evidence demonstrates that Wilmot induced Bouknight into the EEA by misrepresenting his ability to bind CIPR to the terms of the EEA. According to Wilmot's own testimony, CIPR never intended to honor the EEA,

25

and Wilmot knew this within two months after he and Bouknight executed the EEA. However, he continued to assign Bouknight job responsibilities and Bouknight performed his obligations under the EEA for more than a year and a half, relying on Wilmot's initial misrepresentation and on his continued representations that the financing was being arranged and that Bouknight would eventually be paid pursuant to the EEA. We conclude that there is evidence that Wilmot's misrepresentation was the cause of Bouknight's damages, as found by the trial court.

Wilmot also argues that Bouknight waived his $25,000 per month allowance and that Bouknight waived any requirement of written notice of termination, but these contentions are likewise unsupported by the record. Wilmot further contends that employment law principles limit Bouknight's recovery in this case. However, Wilmot does not point to any place in the record where he presented this argument to the trial court. Accordingly, it is waived. *See* TEX. R. APP. P. 33.1(a).

We overrule Wilmot's third issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

26